In the Matter of the Arbitration between
**SANKO S.S. CO. LTD., Petitioner,**

v.

**COOK INDUSTRIES, INC., Respondent.**
No. 72 Civ. 236.

United States District Court,
S. D. New York.

Dec. 8, 1972.

Townley, Updike, Carter & Rodgers, New York City by John P. Meade, Washington, D. C., T. Jefferson Murphy, New York City, for petitioner.

Hill, Rivkins, Warburton, McGowan & Carey, New York City by Vincent J. Ryan, Francis J. O'Brien, New York City, for respondent.

## MEMORANDUM

BRIEANT, District Judge.

Respondent ("Cook") has moved for an order pursuant to 9 U.S.C. §§ 9 and 13, confirming the award of a panel of arbitrators, dated June 19, 1972, and for entry of judgment thereon. Petitioner ("Sanko") has moved for an order pursuant to 9 U.S.C. § 10, vacating the arbitration award. No evidentiary hearing has been held.

 The controversy arbitrated arose out of a maritime contract with respect to which an action in admiralty would have been within the subject matter jurisdiction of this Court. The Federal substantive law of arbitration applies, and the Court has jurisdiction over the parties and the subject matter. Robert Lawrence Co. v. Devonshire Fabrics, 271 F.2d 402 (2d Cir. 1959).

Sanko is a Japanese controlled corporation which has an office in New York, and, in addition, is represented by its "general agent" in New York, J. H. Winchester & Co. ("Winchester"). Sanko is an owner of vessels available, *inter alia*, for charter in the international grain trade.

Cook has been described by our Court of Appeals as "corn dealers in an industry made up of comparatively few companies." Cook Industries, Inc. v. C. Itoh & Co. (America), Inc., 449 F.2d 106, 107 (2d Cir. 1971).

The issues raised on the respective motions may be determined upon uncontested facts set forth in the affidavits of the parties, and the inferences drawn therefrom.

On February 26, 1971, Cook and Sanko entered into a voyage charter party. This charter party provided for arbitration as follows:

## "NEW YORK PRODUCE EXCHANGE ARBITRATION CLAUSE

Should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto and the third by the two so chosen; their decision or that of any two of them shall be final, for the purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be commercial men."

A dispute did arise. The parties entered into a written submission of arbitration, dated May 10, 1972, as contemplated by the Produce Exchange Rules. Three commercial men were nominated; Mr. Barnett by Sanko and Mr. Crooks by Cook. These two, so chosen, appointed Mr. John P. Besman as the third arbitrator.

The arbitrators conducted hearings and the Court has reviewed the transcript. An arbitration award was made, dated June 19, 1972, which describes the

history of the controversy and finds that the charterers (Cook) failed to make a timely nomination of the loading port, ultimately selected as New Orleans, as required by the charter party, and that the owners (Sanko) failed to tender notice of readiness by August 25, 1971, the time limited by the charter party.

The vessel was delayed in discharging at Houston on the completion of her prior commitment, and consequently did not arrive at New Orleans until August 26th, at which time her notice of readiness to load was rejected by Cook as untimely. Cook then exercised its option to cancel in accordance with the charter party.

Cook contended before the arbitrators that as a result of "various conversations", Sanko knew well in advance of the actual nomination that the charterers intended to nominate New Orleans, and that even if official notification of nomination of the loading port had been given timely, the vessel could not have made the canceling date. The panel determined unanimously that Cook had breached the charter party in failing to make a timely nomination of the loading port, but decided that they could not "accept the proposition put forth by owners that there is any causal relationship whatsoever between the charterers' tardy nomination of a loading port by some 24 hours and the fact that the vessel missed her canceling date." Accordingly, the arbitrators unanimously denied Sanko's claim and assessed the costs and arbitrators' fees equally.

■ It cannot be said that this unanimous disposition of the controversy by these three commercial men was unusual, unfair, unjust or unreasonable.

The motion to vacate the award is based on that portion of § 10 of the Arbitration Act, reading as follows (9 U. S.C. § 10):

> "In either of the following cases the United States court * * * may make an order vacating the award upon the application of any party to the arbitration—

> (a) Where the award was procured by corruption, fraud, or undue means.

> (b) Where there was evident partiality or corruption in the arbitrators, or either of them."

Viewing the matter most favorably to Sanko, no such corruption, fraud, partiality or corruption is found.

■ Sanko's charges center around the status of the third or impartial arbitrator, Mr. Besman, chosen by the respective arbitrators of the parties. Sanko also objects to the appearance in the arbitration of Francis J. O'Brien, Esq. as attorney for Cook. For the reasons hereinafter stated, we find the objections without substance. Viewed most favorably to Sanko, the facts do not support a conclusion of "evident partiality", "fraud" or "corruption". Rather, we have a disappointed litigant seeking to evade the prompt and intrinsically sensible determination of the arbitrators by afterthought objections. *Cf.* Cook Industries v. Itoh, *supra.*

Charter party disputes, such as present here, are customarily arbitrated, in large numbers, expeditiously and economically, pursuant to a New York Produce Exchange Arbitration Clause contained in the printed forms of charter party. Such arbitrations must take place before "commercial [shipping] men", rather than before lawyers or judges. Such persons, like corn dealers, are not unlimited in their number. Besman is such a commercial man. He is President of Sagus Marine Corporation ("Sagus"), which company acts as a chartering broker, primarily for owners, in negotiating the charter of vessels for a commission. He has served most actively since 1960 as an arbitrator in disputes within the shipping industry. He is prominent in the "Society of Maritime Arbitrators, Inc.", which was founded in New York in 1965 to improve the quality of such arbitration, and to publish opinions in arbitration cases. From 1968 to 1970 he was President thereof, and claims to have served in

more than 100 arbitrations of this nature, primarily as the "third man".

Besman knew the rules as to potential partiality or conflict of interest. At the opening of the hearing, the transcript before the arbitrators contains the following:

> "THE CHAIRMAN (Besman): Let the record show that . . . in accordance with the Supreme Court decision with regard to making prior disclosure with regard to any relationships between the arbitrators and the litigants, I would like to say that the company I represent has had occasion to do business with Cook Industries, the charterer, of a spot nature. None that I know of with Sanko Steamship Company.

> MR. BARNETT: I have no connection or relationship with either Cook or Sanko, never did any business with either.

> MR. CROOKS: I have never had anything to do with Sanko at all and only know of Cook Industries through Space Brokers, who are my chartering brokers.

> MR. BARNETT: I would have to say yes, I know of Cook through Space Brokers.

> THE CHAIRMAN: We are not talking about knowing of them but having substantial business with. Is the panel as constituted acceptable to the attorneys?"

Sanko's attorney did not directly answer on the record the question as to whether the panel was acceptable, but he did waive the swearing of the arbitrators and thereafter proceeded without objection in the conduct of the arbitration.

■ Sanko relies on Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed. 2d 301 (1968), holding that an award must be vacated where an arbitrator failed to reveal a business relationship as a consultant to one of the parties. That is the only sort of relationship (one with a party) which *Commonwealth Coatings,* on its facts, requires arbitrators to disclose, even though Mr. Justice Black did state in the majority opinion (p. 149, 89 S.Ct. p. 339):

> "We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias."

We read the reference to "any dealings" as meaning "any dealings with the parties", because that is the factual context of the *Commonwealth Coatings* case.

Besman had no dealings with the parties. Sanko seeks to extend the doctrine of *Commonwealth Coatings,* and charges that Sagus is owned or controlled by "a grain company which has had extensive business dealings with the respondent in the arbitration, also a grain company."

The grain company intended to be referred to is a French partnership, Louis Dreyfus. Dreyfus, in Paris, owns vessels. When Dreyfus wishes to charter these vessels, engaged primarily in the grain trade, it uses Sagus as its broker. Sagus has separate offices, located on the same floor at One State Street Plaza in Manhattan, as is "Louis Dreyfus Company of New York", but the New York company is primarily a grain charterer, and although owned by the French partnership, is not the owner of, nor an affiliate of Sagus.

As observed by our Court of Appeals in *Itoh, supra,* there are comparatively few grain exporting companies. Respondents assert that there are six: Continental Grain Corporation, Bunge Corporation, Tradax, Inc. (Cargill), Garnac Grain Co., Dreyfus and Cook.

It is not disputed that these few companies in this narrow and confined industry are rivals and competitors, as well as occasional customers of each other. They purchase and sell the same commodity in the same markets, to and for the same customers, and use the same transportation facilities.

The only transactions between Cook and Dreyfus consist of occasional purchases and sales of the commodity, based on arms-length transactions. The relationship between Dreyfus and Cook is primarily one of rivals and competitors.

I conclude that viewed most favorably to Sanko, the relationships between the arbitrator Besman and Sagus and between Sagus and Cook were adequately stated on the record before the arbitrators; the occasional business relationship between Dreyfus of France and Cook is insubstantial and not sufficient to disqualify Besman. Even if it be assumed that the American Dreyfus Company, because of its affiliation with the French partnership, automatically becomes an affiliate, or a sort of corporate first cousin once removed of Sagus, such a relationship would not be substantial to cause a disqualification of Besman, within the doctrine of the *Commonwealth Coatings* case. This is all the more so when the objection is raised to the arbitrator after the hearing has been conducted and the award filed.

A similar situation exists with respect to the representation of Cook in the arbitration by attorney O'Brien.

Mr. O'Brien is an attorney engaged in the practice of admiralty law, with emphasis on representing parties in connection with disputes arising out of the chartering of vessels. From 1953 until December 31, 1971, he was first an associate and thereafter a member of Zock, Petrie, Sheneman and Reid, a well-known New York law firm engaged in admiralty practice. Effective January 1, 1972, he became a member of Hill, Rivkins, Warburton, McGowan & Carey, attorneys for Cook, in this matter. The Zock firm has represented Dreyfus (France) in approximately five admiralty matters, apparently never as general counsel, or exclusively.

The number of law firms engaged in admiralty practice in this District, like the number of "commercial men" acting as arbitrators therein, is relatively limited. Mr. Besman tells us without contradiction that because of this fact and because of the additional unobserved, but nevertheless real presence in admiralty litigation and arbitrations, of the "underwriters" who are usually the real parties in interest, but never appear on the record as such, the firms engaged in the shipping industry from time to time are represented by various law firms in different matters. This fact is well known to the shipping industry in New York, and indeed to this Court. Accordingly, it follows that any arbitrator regularly associated or employed in the shipping industry is likely to have appearing before him the same attorneys who may have represented his employer in other matters.

Naturally, the arbitrators, the lawyers, the grain exporters and the shipping industry people in New York, owners, charterers and their brokers, are all well known to each other. This too should be known to all who subscribe to the arbitration clause.

Mr. O'Brien's former law firm has represented four of the six major grain export houses during the years, and has also represented shipowners and others involved in arbitrations. As such, he or his former firm appeared in numerous matters before Mr. Besman as one of the arbitrators. He has reviewed the arbitration awards collected and published by the Society and finds that he appeared before Besman as an arbitrator in more than 20 cases. He tells us that "Mr. Besman decided (some 11 cases) adverse to the interests of my former firm's clients." No inference of any kind can be drawn from the relative degree of success which Mr. O'Brien's former firm enjoyed before arbitrator Besman, but it at least appears obvious to the Court that as a matter of ordinary routine practice, those engaged in shipping and the relatively small admiralty bar which serves their interests, have regularly appeared before Besman and other arbitrators for a long time, with no real or apparent difficulty in

having their commercial disputes settled quickly and fairly by "commercial men". This is all that the contract and submission of arbitration required. The statute does not require otherwise. Persons engaged in trade have constructive notice of the customs and usages, even in the absence of actual notice. U.C.C. § 1–205 (New York).

It would be adding an undue nicety and unwarranted burden on the daily arbitration of commercial disputes with respect to which this industry usually accomplishes substantial justice if we should say that it is "improper", "fraudulent", "corrupt" or "undue" for an arbitrator to act in a case where one of the lawyers formerly belonged to a law firm which formerly represented his employer in an unrelated matter. This is particularly true where, as here, representation by the Zock firm was not exclusive or continued, but rather was occasional and dictated at least in part by the fact that different P & I clubs or underwriting interests are involved in various cases. The Court knows that in most cases, the insurers, having accepted the burden to defend a claim, guard jealously their right to designate counsel of their own choice.

█ Viewed most favorably to Sanko, no basis appears which would support a finding that the arbitration award should be set aside by reason of the participation of attorney O'Brien through his new firm.

Sanko urges on these motions, and in the absence of an evidentiary hearing, we must accept as true, that it had no actual knowledge of the business interrelationships in the grain industry. There is adequate uncontroverted evidence to find both imputed knowledge and constructive knowledge, but for the reasons previously stated, we need not reach that issue in order to confirm the award.

Those in New York engaged in the ocean transport of grain had a general commercial knowledge that Sagus had acted as owner's broker for Dreyfus for 20 years. On April 4, 1972, Besman wrote Sanko's counsel as follows:

"Unless valid objection is raised, it is the intention of the Arbitrators that this case will be conducted under the Rules of the Society of Maritime Arbitrators of New York."

That association publishes a booklet which contains a list of the persons "qualified" by it as arbitrators. Besman's listing therein indicates "With the Louis Dreyfus organization and affiliates for 20 years." Sanko had an office at 19 Rector Street in Manhattan in the same building, but not in the same room, as its general agent in the United States, Winchester. Winchester is an established firm of chartering brokers, which has dealt with Besman for more than 20 years. Winchester's people are fully familiar with the nature of Besman's business, the nature of Dreyfus business, and the relationship between Besman and Dreyfus. An employee of Winchester for more than 35 years, Vislocky, appeared and testified before the arbitrators that Winchester was the *general* agent for Sanko. Winchester has negotiated charters with Sagus. Although Vislocky maintains by affidavit that he did not inform Sanko or its attorneys of this relationship, and the two individuals, Japanese nationals, who operated the New York office of Sanko, each state that they did not know, there is nevertheless a basis to find imputed knowledge through the general agent. The matter at issue was of a substantial nature. Sanko does not deny that its general agent participated in connection with its efforts to resolve this matter by arbitration.

The offices of Sagus are on the same floor as that of Louis Dreyfus Company of New York, although there are separate entrances. In the conference room, where the arbitration proceedings were held, attended by several representatives of Sanko, and a seasoned employee of

Winchester, the name "S. A. Louis Dreyfus & Cie." appeared on the wall.

Petitioner's motion to set aside the arbitration award rendered June 19, 1972 is denied, and respondent's motion to confirm is granted.

Settle order on notice.