UNITED STATES WRESTLING FEDERATION, Plaintiff-Appellee,

v.

The WRESTLING DIVISION OF the AAU, INC., and Amateur Athletic Union of the United States, Inc., Defendants-Appellants.

No. 79–1251.

United States Court of Appeals, Seventh Circuit.

Argued June 15, 1979.

Decided Aug. 17, 1979.

Michael Lesch, Shea Gould Climenko & Casey, New York City, for defendants-appellants.

Edben C. Crawford, Cleveland, Ohio, for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT and PELL, Circuit Judges.

PELL, Circuit Judge.

This case involves a controversy between two would-be United States sponsors of amateur wrestling matches, and in the process of settling their dispute they have gone to the mat successively before an arbitration panel and the district court, and now resume their grappling in this court.

The district court judgment from which the present appeal is taken confirms the arbitration award unanimously rendered by a three-person arbitration panel. The panel was not of the type sometimes found in which each party appoints an arbitrator and by one method or another a neutral chairman is appointed. In the present case, the American Arbitration Association (AAA) submitted the names of prospective panelists and from this list the parties selected the three who heard the case. All three were practicing Chicago lawyers. The principal issue raised on this appeal is whether the chairman's failure to disclose on his own motion various connections that he and his law firm had with Northwestern University (Northwestern) is sufficient cause to vitiate the confirmed decision of the panel. A secondary issue rests upon a claim of "evident impartiality" on the part of the chairman within the meaning of 9 U.S.C. § 10(b), although it would appear that this issue is presented more for the purpose of buttressing the primary issue than as an independent ground for relief.

The present lawsuit is apparently but the tip of a much more widespread and ongoing fight between two bodies and various affiliated or associated organizations of each for the privilege of being the national governing board in various fields of amateur athletic endeavor. The particular case which we have before us arose out of the decision of the United States Olympic Committee (USOC), acting through its executive board, denying the application of the United States Wrestling Federation (USWF) to be designated as the "Group A member," i. e., the national governing body of the USOC insofar as the wrestling at the Olympic Games was concerned. The effect of this ruling was to continue as the Group A member of the USOC in wrestling the defendant, The Wrestling Division of the AAU, Inc. (WD/AAU). At the time of the litigation the full name of the organization of which The Division was a defendant was the Amateur Athletic Union of the United States, Inc.

Pursuant to a provision of the USOC constitution USWF submitted its claim for the Group A membership to the AAA for binding arbitration by a panel of three arbitrators under the AAA's commercial rules. The gist of the claim to be presented to the arbitration panel was that USWF was better qualified to act as the Group A member for amateur wrestling of the USOC and should replace therefore the WD/AAU. The three arbitrators jointly selected by the party were Frank F. Fowle, Samuel F. Lawton, Jr., and H. Blair White. The arbitrators themselves selected White to serve as chairman of the panel and to preside at the hearings.

In October 1977, Lawton disclosed to the AAA that he had represented one of the attorneys for WD/AAU in obtaining certain zoning variations under the Chicago ordinance. The matter had previously been concluded. Both parties waived any real or presumed disqualification to his service based on said disclosure.

In December 1977, counsel for the parties met with the arbitrators and there was extended discussion of matters that would become involved in the hearing with particular reference to discovery matters. Counsel for WD/AAU made it clear to the arbitrators that in his opinion the real disputants in the battle going on was between the AAU on the one hand and the National Collegiate Athletic Association (NCAA) on

the other hand which dispute had been going on for a good many years.[1] He also mentioned that the style of wrestling had been one of the subjects of dispute "between these two organizations, that the NCAA, which does have control or certainly very strong influence over the wrestling programs in many colleges," had persisted in its view that a certain style of wrestling should be encouraged. It is the position of the WD/AAU in this litigation that references such as these at the time of the December meeting should have triggered an alertness to the connection of Northwestern with the NCAA and further that that should have caused arbitrator White, because of his connections, direct and indirect with Northwestern, to have disclosed this information to the parties.

The actual arbitration hearings commenced on May 22, 1978, consumed seventeen days during which thirty-one witnesses were examined and cross-examined, and resulted in over 4000 pages of transcript. By award, dated September 7, 1978, the three arbitrators unanimously found in favor of the USWF. This decision was confirmed by the district court and this appeal followed.

In its brief here WD/AAU states that a principal issue in the arbitration from the outset was the extent of NCAA control over the USWF because the USOC constitution required that the Group A member be autonomous in the administration of its sport. The correctness of the decision of the arbitrators is not involved in this appeal. The only issue before us is whether the decision was tainted because of White's nondisclosure or because of his asserted bias toward one of the parties. Nevertheless, returning to the December 1977 session, we note from the facts developed there that there appeared to be considerable possibility of diffusion of authority reflecting on autonomy as to WD/AAU itself. This organization is composed of some 58 local associations, each of whom elects two representatives to the national committee, and of certain allied members such as the National Association of Intercollegiate Athletics, being smaller colleges, and three military services each having a representation on the AAU wrestling committee. The National Jewish Welfare Board and the YMCA are also each represented on the national committee. We mention this factor merely as showing the infinite possibilities for potential disclosure of connections beyond the parties directly involved.

■ Turning now to the facts on which WD/AAU claims that a duty of disclosure arose on the part of White, these are as follows: NCAA's relationship with USWF included its role as the principal founder of USWF, its financing and directing the arbitration proceeding against WD/AAU, and its substantial contribution financially to USWF's activities. Northwestern is a member of the NCAA as are more than 860 other institutions, conferences, and organizations devoted to intercollegiate athletics in all of its phases. Northwestern has paid some $25,000 to NCAA since 1975, and has received more than $1,000,000 since 1976 from the NCAA's television football program as do, of course, many other institutions. Since 1958 Northwestern has employed one Ken Kraft as its head wrestling coach. Kraft is one of the three original incorporators of USWF, is a former president of it, and currently serves as a voting member-at-large of USWF's governing council. He also was a principal witness for USWF at the arbitration. Since the creation of the USWF in 1968, Northwestern has hosted some wrestling matches for which Kraft was instrumental in securing Northwestern as a site.

The crux of the claim that disclosure was required lies in the relationship of chairman White and his law firm, Sidley & Austin, with Northwestern, but not to USWF or NCAA. The law firm itself has over 200 attorneys, partners and associates. It has represented Northwestern on a regular, but not exclusive, basis for the last 25 to 30 years. During the last 2 years preceding the pertinent time here involved somewhere

---

1. The NCAA was not a party to this proceeding. It had, however, connections with USWF and with Northwestern which will be set forth more specifically hereinafter.

between 15 and 25 Sidley & Austin attorneys have worked on Northwestern University matters. Northwestern over the years has paid Sidley & Austin "very substantial fees." One of chairman White's partners has served as Northwestern's general counsel since 1971. In such capacity he maintains an office at Northwestern and is directly compensated by Northwestern. At the time of the hearing there were two of White's partners who were trustees of Northwestern with full voting rights on the board of trustees. Other partners had previously served as trustees from time to time although there were times when no partner was a member of the Board of Trustees. White himself was a member of Northwestern University Associates which was described as a "long-range fundraising organization." This was an organization formed in the late 1920's to promote a close relationship between the University and top corporate and professional leadership in the Chicago area. It has about 400 members who meet several times a year to hear a University official or faculty member speak on some topic related to the University.

There is no evidence in the record that either White or his law firm had ever had any relationship whatsoever with (1) the NCAA, (2) Kraft, the wrestling coach, (3) USWF, or (4) WD/AAU. There is also no evidence in the record that White had any

knowledge of, or interest in, wrestling (other than his participation in the arbitration proceeding) either before or after the arbitration.

WD/AAU takes the position on this appeal that it was undisputed and conceded that the facts related above with regard to White and his law firm's relationship with Northwestern were unknown to WD/AAU officials or members or their counsel at the time of the arbitration. The USWF disagrees both as to the lack of disputation and the concession. We are inclined to agree with the analysis of USWF as to the record although this, of course, is not to say that any of the WD/AAU parties did in fact have knowledge of the challenged connections. The testimony of Newt Copple [2] was that he had no knowledge of the connections and did not include other persons in the WD camp. There is no evidence in the record as to whether WD/AAU officials or members (other than Copple) or its attorneys did or did not have knowledge of Sidley & Austin's representation of Northwestern prior to the award. At oral argument counsel for WD/AAU stated that when a panel of arbitrators had been submitted to them, they had an opportunity for a background check, and they ultimately, with opposing counsel, had selected the ones they regarded as the three most eminent lawyers

---

2. Copple was National Chairman of WD/AAU during the preceding seven years and its principal benefactor having made substantial donations to it in the previous years. Following the decision of the arbitration, he caused an investigation to be made into the background of the three arbitrators which revealed to him the relationship between White, his law firm, and Northwestern. Copple, not surprisingly, in the present litigation testified emphatically that he would immediately have instructed his attorneys to challenge White if he had known, prior to the commencement of the arbitration or during the arbitration, that White's firm represented Northwestern. This, of course, is easy enough to say after the fact. From our observation, at least at the full time judicial level, where a disclosure of some relationship is made by a judge, there seems to be a disinclination to indicate that he or she should withdraw. This, of course, in fairness could result from the fact that the attorneys have in mind they may appear in other cases before the same

judge and do not wish to antagonize him. (The motivation not to antagonize a judge, of course, would not exist with the same force as to an arbitrator.) Because of this the Code of Judicial Conduct for United States Judges formerly under Canon 3 provided that where there were financial interests the judge should advise the parties and the parties were unanimously to agree that the judge stay in the case or otherwise he should recuse himself, and unless all did request the continuance, the clerk should not tell the judge which lawyer or parties did not make such a request. Since March 1975, again perhaps to remove lawyers from this position of dilemma, there has been an absolute prohibition against a judge participating in a case in which he has a financial interest in a party.

In any event, we regard the material matter here as to whether White should have made a disclosure and not what the conjectural result might have been if he had disclosed.

on the panel submitted. Counsel was asked about local counsel which was a large Chicago firm, that of Sonnenschein, Carlin, Nath & Rosenthal. This firm, while engaged as local counsel, did not participate in the arbitration hearing itself. The record does not indicate whether the background of the arbitrators was checked with the local counsel by the New York counsel who were to conduct the arbitration proceedings.[3]

We note one other preliminary matter. The decision of the arbitration board presumably represented the independent thinking of two Chicago lawyers characterized by WD/AAU counsel as "eminent." We have no reason for thinking that the decision did not represent their studied opinion as to the proper result. We do not, of course, discount the possibility that two members of a panel might very well give serious thought to a strongly held contrary view by the third member although dissents in three judge panels at the court of appeals level do not indicate any rule of certainty in this respect. In any event, in view of Mr. Justice Fortas' dissent in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 152, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), we will assume that an arbitration award may be set aside despite the fact that the award is unanimous by all three arbitrators if it is tainted by a duty of disclosure on the part of one.

White's duty to disclose, if such existed, must rest primarily upon Rule 18 of the AAA's Commercial Rules governing disclosure responsibilities. That rule provides:

Section 18. DISCLOSURE AND CHALLENGE PROCEDURE—A person appointed as neutral Arbitrator shall disclose to the AAA any circumstances likely to affect his impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their counsel.

The record is clear that White had no past or present relationship with the parties or their counsel. Likewise there is no basis for thinking he had any financial interest in the result of the arbitration. This leaves only a personal interest or bias. We will discuss the bias matter, which is asserted as an independent ground for reversal, subsequently.

One of the cases upon which WD/AAU relies is *Commonwealth Coatings, supra*, which emphasized that Section 18 in its then form required that any tribunal permitted by law to try cases or controversies not only must be unbiased but also must avoid even the appearance of bias. We agree as to the importance of avoidance of the appearance of impropriety. There was, however, a direct connection in the facts of *Commonwealth Coatings* which did not exist in the case before us. In that case the Supreme Court held that where the only "neutral" arbitrator on the three-man panel (each of the parties having unilaterally selected one of the other arbitrators) had failed to disclose that his engineering firm had done significant and repeated business with the prevailing party in the arbitration, the award must be vacated.

The WD/AAU also relies upon *Sanko S. S. Co., Ltd. v. Cook Industries, Inc.*, 495 F.2d 1260 (2d Cir. 1973) and *In Re Heirich*, 10 Ill.2d 357, 140 N.E.2d 825 (1956). We regard WD/AAU's reliance upon these decisions as being equally misplaced.

In *Sanko*, the Second Circuit reversed and remanded for an evidentiary hearing the district court's decision (352 F.Supp. 386) confirming an award without a hearing where the appellant had alleged that the only "neutral" arbitrator on the three-man panel had failed to disclose that his company had regularly retained the attorney who represented the prevailing party in the arbitration and had also failed to disclose the full nature and extent of the relationship

---

**3.** If this inquiry had been pursued at the Sonnenschein firm knowledge of Northwestern connections with Sidley & Austin might have been rather quickly developed. The biographical section of Martindale-Hubbell Law Directory shows that several partners of that firm hold degrees from Northwestern including one who since 1959 has been, and apparently still is, the Harriman Lecturer in partnership and corporation law at Northwestern's School of Law.

between his own company and the prevailing party. Again there was a direct relationship between the arbitrator's own company and the attorney who represented the prevailing party in the arbitration. In both cases there appears to be a clear violation of AAA Rule 18. We do not find that situation in the case before us.

Perhaps because of these distinguishing factors, in oral argument counsel for the appellant placed primary emphasis on *Heirich*. We agree, however, with the appellee that *Heirich* provides no authority for the facts of the present case and is distinguishable in that (1) it did not involve an arbitration under the AAA's Commercial Rules; (2) it was not decided under the Federal Arbitration Act which was involved in *Commonwealth Coatings*; (3) the court's language is addressed to a situation where "an arbiter has a financial interest in the subject matter" of the proceeding; (4) the court held that the commissioner erred in refusing to recuse himself after being challenged "not in failing to disclose a 'relationship' "; and (5) the court overruled the commissioner's recommendation of disbarment because it was not supported by the evidence, not because the commissioner failed to recuse himself.

On the other hand, the case of *Reed & Martin, Inc. v. Westinghouse Electrical Corp.*, 439 F.2d 1268 (2d Cir. 1971) and the Illinois case of *Lucke v. Spiegel*, 131 Ill. App.2d 532, 266 N.E.2d 504 (1970) cited and relied upon by USWF appear to be sufficiently distinguishable as to be of slight help in reaching our decision. In *Reed & Martin*, we are unable to tell whether the claim of bias, which does not appear to have been raised in the district court, involved a matter of nondisclosure. There is no indication in the Second Circuit's opinion that there was or was not disclosure at the time the arbitration was underway. The opinion does show that Westinghouse who had prevailed on the arbitration, had named an appointee whose law firm had had dealings with General Electric Co. and that that company had been litigating contract clauses identical or similar to those involved in the present case. The court did state that

the arbitrator's law firm's connection with General Electric had little weight in showing the arbitrator's bias under the Federal Arbitration Act. 439 F.2d at 1275. We are uncertain from the opinion whether the same result would have been reached if the neutral arbitrator's law firm was actively engaged in identical or similar litigation for a competitor of one of the parties.

We agree with WD/AAU that *Lucke* is quite a different case and involves a much more remote connection than that asserted in the present case. In *Lucke* the court rejected the argument that there was evident partiality by one arbitrator where the only evidence was that the arbitrator had, on one prior occasion thirteen years before the arbitration, employed one of the witnesses for a job that took five days. Notwithstanding the substantial difference between *Lucke* and the present case insofar as the numerosity of points of contact were concerned we do accept as a guiding principle the statement by the Illinois court that:

> The interest or bias of an arbitrator must be direct, definite, and capable of demonstration rather than remote, uncertain, or speculative. 131 Ill.App.2d at 536, 266 N.E.2d at 508.

In sum, we conclude that there is no authority directly in point and because there is such an infinite number of possibilities of claims for some connective basis for disqualification, it probably is necessary to consider cases of this type on a case-by-case basis. This has its unfortunate connotations. Arbitration of commercial disputes is of importance to the business world as a means of resolving controversies expeditiously and relatively economically so that the contestants may go about their business without undue delay or cost. Dragging an arbitration award through months, if not years, of subsequent litigation will certainly frustrate the salutary purpose of arbitration. Accordingly, while to some extent a case-by-case approach may be necessary, and we do not discount the ingenuity of attorneys for the losing party to find a plausible basis for challenge, we will at

least endeavor to lay down a few general guidelines which perhaps can facilitate a quick disposition if the meritless case is taken to court. In doing so we are not unmindful of the great number of opinions that the ethics committees of various organized bar associations have found it necessary to render over the years when concrete factual situations and the applicability of various generalized canons of ethics were involved.

We have already indicated that we think one clear test was that which we have quoted above from *Lucke*. We also think that the courts handling these cases also will be greatly aided by approaching the cases with the viewpoint expressed by Mr. Justice White in his concurring opinion in *Commonwealth Coatings, supra* :

> The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges. It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function. Cf. *United Steelworkers v. Warrier & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). This does not mean the judiciary must overlook outright chicanery in giving effect to their awards; that would be an abdication of our responsibility. But it does mean that arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial. I see no reason automatically to disqualify the best informed and most capable potential arbitrators.

> \*  \*  \*  \*  \*  \*

> Of course, an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography. But it is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed. If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating the award.

393 U.S. at 150, 152, 89 S.Ct. at 340–341.[4]

We cannot argue other than that arbitrators would be well advised if they desired their decision not to be subject to the kind of attack here involved if they did as admonished by Mr. Justice White "err on the side of disclosure." Chairman White having not disclosed, of course, we ultimately will have to decide whether the relationships now being challenged are too insubstantial to warrant vacating an award. We find further guidance for the present case in Canon 3 of the Code of Judicial Conduct for United States Judges even though the concurring opinion of Mr. Justice White makes it clear that an arbitrator need not be held to this strict a standard. Canon 3 reads, insofar as pertinent to the present issue, as follows:

C. *Disqualification*

(1) A judge shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

\*  \*  \*  \*  \*  \*

(c) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the pro-

---

4. For whatever significance it has we note that four members of the Court who participated in the decision of *Commonwealth Coatings* are still members of the court. One, Mr. Justice Brennan, joined in the majority opinion written by Mr. Justice Black. Mr. Justice Marshall joined the concurring opinion of Mr. Justice White and Mr. Justice Stewart joined the dissent of Mr. Justice Fortas which would have affirmed the arbitration award rather than setting it aside.

ceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

\* \* \* \* \* \*

(3) For the purposes of this section:

(c) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:

(i) ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) an office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) the proprietary interest of a policy holder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

Bringing to bear upon the present case the above guidelines, we are convinced that the relationship of White to USWF, the party here, via the tenuous chain of his and his firm's relationship to Northwestern and Northwestern's relationship to Ken Kraft and the NCAA and their relationship to USWF, the only party herein, is too "remote, uncertain, and speculative" to require the arbitration decision to be set aside. As Mr. Justice White pointed out in the concurring opinion, if there is a business relationship "with the parties," both parties should be informed of the relationship in advance, although if the relationship is trivial, the potential arbitrators need not be disqualified. Here, of course, there was no financial relationship between Chairman White or any of his partners with any of the litigating parties. This was not a case analogous to a wholly owned subsidiary. The USWF had many members who controlled its operation. The NCAA included among its membership Northwestern, but Northwestern was one of more than 860 institutions, conferences, and organizations devoted to intercollegiate athletics in all its phases.

We entertain little doubt that if at the time of the December 1977 conference Chairman White had related that he and his law firm had various relationships with Northwestern, of which he was an alumni, and, as he might well have guessed even if he had not known, that Northwestern probably had some connection with the NCAA, that the next step would have been for the other two members of the panel to have indicated that both they and some of their partners had connections with institutions, at least as alumni, which were members of the NCAA. Indeed if there had been emphasis on Northwestern connections, all of the arbitrators had partners who were alumni of either the college or law school of Northwestern according to Martindale-Hubbell's biographical pages. Mr. Lawton might even have brought up under these circumstances that one of the senior partners of the firm with which he is "of counsel" had been a recipient of the Northwestern Alumni Award of Merit in 1973, again according to the Martindale-Hubbell biographical section. To embark upon disclosing relationships with non-parties who in turn might have relationships with a party particularly when many non-parties had similar relationships would be "to provide the parties with his complete and unexpurgated business biography," see *Commonwealth Coatings, supra,* on the remote and speculative chance that there was some disqualifying connection. Lawton did, of course, disclose that which was required by AAA Rule 18 that he had a *direct* past relationship with one of the *counsel* of one

of the *parties*. Even if the NCAA had been a party, which it was not, there is no support in the record for any connection between Chairman White or any of his partners and the NCAA. The various connections with Northwestern do not, in our opinion, present the appearance of impropriety with regard to the NCAA insofar as White was concerned. The relationship between the NCAA and Northwestern had financial aspects but not one of any exclusivity or control in either direction.

Turning to the higher standards for United States judges, we find some significance in analogizing this case with the definition of financial interest. If there is *direct* interest, even though it is small, it disqualifies. On the other hand, ownership of shares of a mutual investment fund is not a basis for disqualification even though it is well known that a large mutual investment fund may have in its portfolio very extensive and substantial blocks of stock of many corporations. Thus, if the mutual investment company owned a large block of stock in X corporation which was a party litigant, and the judge owned stock in the investment company but not in X corporation, he would not have to disqualify himself. On the other hand, if X corporation was the litigant, and the judge owned one share, then this direct ownership would require him to disqualify himself. Likewise an office in an educational organization is not a "financial interest" in securities held by that organization, and it would seem likewise that there should be no disqualifying interest in other organizations in which the educational organization was a member.

Even though WD/AAU was a loser in the arbitration we have no reason to suggest a lack of good faith on its part. We nevertheless are interested that the position of a local university whose legal work presumably was being performed by local attorneys and who had numerous graduates in the area where the school had long been located and which had connections with the NCAA, all of which we can safely assume was well known to WD/AAU at the time it entered the arbitration would not have promoted some background investigation if it had been deemed at that time that association in various ways with the NCAA was that important or significant. The identity of the trustees of a university of this size is no secret and could have been readily ascertained if it had been deemed important. Instead, as counsel advised us on oral argument, the parties merely selected these three as being the most eminent of the panel. We recognize that perhaps ordinarily it might be more difficult to ascertain who the counsel for a university might be, but if that was as important as WD/AAU now says it is, it certainly would have been an easier matter where the representation had continued for some 25 years. We find that they are not now in a very good position to cry foul. By saying this we, of course, are not suggesting that failure to check the background of arbitrators is in any way a waiver of the existence of disqualifying factors which were unknown even though they could have been fairly easily ascertained. We advert to this particular aspect of the case merely because of the overemphasis which WD/AAU has placed upon the relationship of Northwestern with NCAA and USWF, which if it were as vitally significant as WD/AAU now says it is, must have been so prior to the beginning of the arbitration. We simply do not think that it has that vital significance.

We would give little significance to fundraising activities on the part of a university even though the university were a party to the arbitration as we think we could safely take notice of the fact that there are very few law schools who have not importuned from time to time at least their eminent graduates not only to contribute to the law school but from time to time to take part in its fund-raising activities. Even the public institutions of higher learning now have their own foundations soliciting contributions and asking alumni to work on behalf of the foundations.

Our holding, therefore, is that there was no duty of disclosure on the part of Chairman White under the circumstances of this case and if we were to hold to the contrary

we would make it virtually impossible for any partner of a large law firm to made adequate disclosure.

■ As noted previously, a second issue was raised by WD/AAU to the effect that the district court erred in concluding that the chairman of the arbitration panel had displayed "evident partiality" within the meaning of 9 U.S.C. § 10(b). WD/AAU contends that the record of the arbitration proceeding was replete with statements and questions favoring USWF. In support of this contention, WD/AAU lists eighteen instances in its brief. We have reviewed these episodes in the context of the voluminous transcripts of some 4000 pages and disagree with the appellee that any clear pattern of bias or partiality is demonstrated. The chairman did make rulings on evidence and ruled against both parties and we could detect that the chairman was attempting to see that the arbitration hearing, which consumed seventeen trial days, did not drone on interminably. We think he had some responsibility to this end. The record that was generated here refutes any contention that both parties were not given a full and fair hearing before the tribunal of arbitrators.

For the reasons herein set out, the judgment of the district court is

AFFIRMED.

SWYGERT, Circuit Judge, concurring.

Although I am unhappy about the situation presented here, I am not unhappy enough to dissent from the result reached or from Judge Pell's reasoning. I do, however, want to register that unhappiness by voicing a strong admonition to arbitrators, and especially to lawyers who are chosen to act as arbitrators, to show more sensitivity to possible violations of Rule 18 of the AAA Commercial Rules than was exhibited by Chairman White.

The arbitration involved a conflict between the United States Wrestling Federation ("USWF") and the Wrestling Division of the Amateur Athletic Union of the United States, Inc. ("WD/AAU"). The National Collegiate Athletic Association ("NCAA") financed and directed the arbitration for the USWF against the WD/AAU.

Northwestern University is a member of the NCAA and has paid dues in excess of $24,000 to the NCAA since 1975. It, in turn, has received in excess of one million dollars from the NCAA's televised football program since 1976.

Since 1958 Northwestern has employed Ken Kraft as its head wrestling coach. Kraft was one of three original incorporators of the USWF, is a former president of the USWF, currently serves as a voting member-at-large of the USWF's Governing Council, and was a principal witness for the USWF at the arbitration hearing. Since the USWF's creation in 1968, Northwestern has hosted the Federation's first national free-style championships in 1969, the USWF sponsored U.S.–U.S.S.R. dual meet in 1971, and since 1972, the annual USWF sanctioned "Midlands Tournament." Kraft was instrumental in securing Northwestern as the site for these events. Northwestern was reimbursed for the expenses it incurred hosting these events, and in the years 1974 to 1978 received over $20,000 for hosting the Midlands Tournament.

Assuming that Chairman White was unaware either of Northwestern's or Kraft's involvement in the NCAA or the USWF at the time he was appointed, I think it would have been wise, if indeed not his duty, to have revealed both his and his law firm's relationship with Northwestern when the foregoing facts were disclosed during the hearing. Yet apparently he did nothing in that direction. On the other hand, the WD/AAU made no attempt to investigate White's background until after the arbitration had ended and it had lost the dispute. To me this was inexcusable.

As Judge Pell points out, the salutary expedient of arbitration may be frustrated if arbitrators do not "bend over backward" to observe the rules and canons designed to insure both the reality and the appearance of neutrality. Thus, when an arbitrator's neutrality could be subject to any legiti-

mate doubt, it would seem the wiser course to disclose relationships with interested parties rather than to brush the boundaries of the ethic expressed in Rule 18.