619 F.2d 1196
 Abdallah W. TAMARI, Ludwig W. Tamari and Farah W. Tamari,
co-partners doing business as Wahbe Tamari & Sons
Co., Plaintiff-Appellants,
v.
BACHE HALSEY STUART INC. (formerly Bache & Co.
Incorporated), a Delaware Corporation, Defendant-Appellee.
 No. 79-1937.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 19, 1980.
Decided April 25, 1980.
 
 James M. Breen, Chicago, Ill., for plaintiff-appellants.
 Lawrence M. Gavin, Chicago, Ill., for defendant-appellee.
 Before FAIRCHILD, Chief Judge, and PELL and TONE, Circuit Judges.
 TONE, Circuit Judge.
 
 
 1
 This is the fourth in a series of cases arising out of a dispute over two commodity accounts plaintiff Tamaris formerly maintained with defendant Bache Halsey Stuart's branch office in Beirut, Lebanon.[1] The dispute was submitted to arbitration before the Arbitration Committee of the Chicago Board of Trade (CBOT). The committee entered an award in favor of Bache for a balance due and against the Tamaris on their counterclaim for damages resulting from Bache's alleged mishandling of the accounts. In this action the Tamaris seek to set aside the award on various grounds. On the basis of the complaint, to which the Tamaris attached the entire record of the arbitration hearings, the district court granted Bache's motion for dismissal, ruling that the Tamaris had failed to state a claim. We affirm.
 
 I.
 
 2
 The Tamaris first contend that the award should be set aside because, during the course of the arbitration hearings, the employer of arbitrator Ralph Klopfenstein hired Robert Fivian, a Bache vice president who testified in several of the arbitration hearings. The Tamaris argue that these circumstances demonstrate "evident partiality or corruption in the arbitrators" within the meaning of § 10(b) of the Federal Arbitration Act, 9 U.S.C. § 10(b) (1976),[2] or that they present at least the appearance of partiality and therefore void the award under the principles laid down in Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).[3]
 
 
 3
 The pertinent facts are as follows: The arbitration committee began hearings on December 11, 1975, and continued them at irregular intervals until May 17, 1976. During this time one of the arbitrators, Klopfenstein, was employed as an administrative vice president for Heinold Commodities, Inc. Near the beginning of 1976, a management executive search company, acting on behalf of Heinold, began employment negotiations with Fivian. Fivian learned at the end of January 1976 that it was Heinold that was seeking to hire him. Subsequent to this discovery, Fivian testified before the arbitration committee on three occasions concerning Bache's internal operating procedures and the identification of documents. He had no involvement in or connection with the dealings between the Tamaris and Bache and appeared to testify only because he had been designated by Bache to respond on its behalf to a subpoena to produce documents.
 
 
 4
 On March 17, Fivian agreed to become an administrative vice president at Heinold. Although this position was similar to Klopfenstein's, the latter did not engage in the employment negotiations between Heinold and Fivian.[4] Fivian informed Bache of his new employment on March 29, and he informed the arbitration committee on April 7, the first scheduled hearing after the notice to Bache. During the April 7 hearing, the committee informed the Tamaris of the situation, and Klopfenstein offered to withdraw if either party so requested. After being given a full opportunity to question Fivian and Klopfenstein, the Tamaris asked that Klopfenstein withdraw. Klopfenstein did so and, as a consequence, did not participate in the award. The Tamaris also requested, however, that the entire committee recuse themselves because of taint flowing from Klopfenstein's presence on the panel during Heinold's negotiations with Fivian. This the committee declined to do.
 
 
 5
 In explaining their decision to proceed, the committee emphasized that neither Fivian's change of employment nor Klopfenstein's presence on the panel had affected the course of the proceedings. Committee Chairman Newman stated,
 
 
 6
 Mr. Fivian's testimony has never been really deliberated with this committee to any great extent.
 
 
 7
 He further said,
 
 
 8
 At no time did any other member of this committee know of these negotiations nor were we swayed in any way by Mr. Klopfenstein's opinion or anything that was discussed.
 
 
 9
 CBOT counsel Robert Vanasco, who attended the committee meetings, said,
 
 
 10
 Mr. Fivian's testimony has never been discussed by the committee and to that extent, Mr. Klopfenstein has had no influence on the committee with regard to that testimony, and the committee has, in its deliberations before, assured itself that no prejudice would occur and is ready to go forward with the case.
 
 
 11
 Chairman Newman added,
 
 
 12
 (T)he discussions, decisions rather, that have been rendered during Mr. Klopfenstein's participation have all been procedural and in no case did Mr. Klopfenstein cast a deciding vote. No decisions were made on the merits of the case.
 
 
 13
 On the basis of the transcript of the arbitration hearings, the district court concluded that the Tamaris had received a full and impartial hearing on their claim. We see no reason to disagree with that assessment. The circumstances of which the Tamaris complain plainly do not demonstrate "evident partiality or corruption" on the part of either Klopfenstein or the other committee members.[5]
 
 
 14
 We also conclude that, even viewing the complaint in the light most favorable to the Tamaris, no claim has been stated that would warrant relief due to an appearance of bias. Fivian's negotiations with Heinold were of necessity confidential until an agreement had been reached. When the decision was made, Fivian promptly disclosed it, and the Tamaris were promptly informed by the committee of what had occurred. Klopfenstein offered to withdraw and did withdraw in response to the Tamaris' request. Therefore, even assuming that Klopfenstein might reasonably appear to have had some nontrivial interest in the proceedings because his employer had hired the employee of a party, any appearance of bias was dispelled by the forthright manner in which the situation was handled once it became known. The record of the arbitration hearings, which controls insofar as it is in conflict with plaintiffs' complaint,[6] is similarly devoid of any manifestation of partiality.
 
 
 15
 It is relevant to the appearance of bias issue as well as the actual bias issue that Fivian was not an occurrence witness but rather Bache's delegate to produce documents and answer questions about the firm's operating procedures. His testimony did not relate to disputed issues of material fact, and the Tamaris have shown no prejudice to them even on the assumption that the arbitrators believed everything Fivian said in his testimony. Moreover, Fivian was negotiating to leave Bache and did so during the period in question. The possibility that Bache might have benefited from any indirect affinity that might have developed between Fivian and Klopfenstein because of the new employment relationship is so remote that we think no reasonable person would find an appearance of bias in Bache's favor on this account.
 
 
 16
 Nothing in Commonwealth Coatings or in the other cases relied on by the Tamaris would support a contrary result. These cases involve the failure to disclose relationships that might reasonably give rise to an appearance of partiality; in each of them an arbitrator with a significant connection to a party participated in an award.[7] In the case at bar, the relationship was never significant, and the arbitrator disclosed it at the first opportunity and withdrew.
 
 
 17
 In setting aside an award for bias, the "guiding principle" is,
 
 
 18
 The interest or bias of an arbitrator must be direct, definite, and capable of demonstration rather than remote, uncertain, or speculative.
 
 
 19
 United States Wrestling Federation v. Wrestling Division of the AAU, Inc., 605 F.2d 313, 318 (7th Cir. 1979) (quoting Lucke v. Spiegel, 131 Ill.App.2d 532, 536, 266 N.E.2d 504, 508 (1970). We think this principle applies whether actual bias or merely an appearance of bias is charged. As Justice White said in concurrence in Commonwealth Coatings,
 
 
 20
 (A)rbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial.
 
 
 21
 393 U.S. at 150, 89 S.Ct. at 340. Here the possibility of bias was highly speculative, the facts were disclosed before decisions were made on the merits, and the arbitrator disqualified himself before substantive decisions were made. The Tamaris have failed to state a claim of either bias or the appearance of bias in the Fivian-Klopfenstein relationship, and the district court correctly so found.
 
 II.
 
 22
 The Tamaris also argue that bias can be found in the fact that Bache hired Thomas Triggs, the Secretary of the CBOT "while the arbitration was in progress." The Tamaris allege that the Secretary appointed the arbitration panel and that the Secretary was represented at all hearings by Vanasco, staff counsel to the CBOT. The Secretary might, therefore, have influenced the proceedings, it is argued.
 
 
 23
 In the first place, when the panel was selected Triggs had not been hired by Bache. In addition, CBOT rules do not give the Secretary the authority to select the arbitration panel; rather, they make plain that the Secretary's task with respect to arbitration is purely ministerial.[8] The full committee on arbitration is composed of ten members. Of these ten, eight apparently were assigned to hear the Tamaris' case, but for some reason only seven participated in the hearings, and the number was reduced to six by Klopfenstein's withdrawal. The record does not demonstrate the method by which fewer than all the members of the full committee were chosen to sit on the case, but even if we were to assume the Secretary was somehow responsible, that fact would not enable the Tamaris to state a claim. The award is vulnerable for bias only if the Tamaris can demonstrate "evident partiality or corruption in the arbitrators," 9 U.S.C. § 10(b), or the reasonable appearance of such partiality, Commonwealth Coatings Corp. v. Continental Casualty Co., supra, 393 U.S. at 150, 89 S.Ct. at 340. The Tamaris' argument turns on the tenuous speculation that a biased Secretary could have selected arbitrators who favored Bache. As we have already noted, the arbitration hearing transcripts do not show bias on the part of the arbitrators. Moreover, the decision of the arbitration panel was unanimous. Simple mathematics indicates that the particular composition of the panel should not have mattered under these circumstances.[9] Given all this, we do not think that the speculation that the Secretary might have been biased, that the Secretary might have picked the panel, that the panel might therefore have been biased, and that the result might thus have been infected by prejudice or tainted by an appearance of bias is in any sense sufficient to make out a claim. United States Wrestling Federation v. Wrestling Division of the AAU, Inc., supra, 605 F.2d at 318.
 
 
 24
 The Tamaris did not raise in the district court the issue of bias resulting from Vanasco's alleged representation of the Secretary at the hearings, so it is too late to do so here. We have examined, however, the portions of the hearing transcript relating to the instances of participation by Vanasco that the Tamaris allege give rise to an appearance of bias. We find no evidence of partiality in them. The Tamaris argue, in substance, that the Secretary was biased or appeared to be biased because at some point he went to work for Bache, that Vanasco was biased or appeared to be biased because he may have been the representative of the Secretary, and, finally, that the arbitrators were biased or appeared to be biased because they were exposed to the views of Vanasco. The argument is both untimely made and frivolous.
 
 III.
 
 25
 The Tamaris next argue that the arbitrators were biased in their determination that the Tamaris' presence before the committee was voluntary. This is the case, they contend, because the arbitrators were all drawn from the CBOT arbitration committee and therefore had a vested interest in finding that arbitration clauses in commodity customer agreements are not contracts of adhesion.
 
 
 26
 This court held in Tamari II, 565 F.2d 1194, 1201-02 (7th Cir. 1977), cert. denied, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978), that the question of whether the Tamaris had voluntarily submitted the dispute to arbitration was to be decided by the arbitrators. The CBOT arbitration panel determined that it had jurisdiction to hear the dispute because the Tamaris had voluntarily submitted it to them. That decision is subject to review here only under the provisions of 9 U.S.C. § 10. National Railroad Passenger Corp. v. Chesapeake & Ohio Railway, 551 F.2d 136, 141-42 (7th Cir. 1977). The Tamaris contend that the jurisdictional decision is tainted by "evident partiality or corruption in the arbitrators" within the meaning of § 10(b).[10]
 
 
 27
 There is no inherent bias or appearance of bias in the arbitration panel simply because its members were drawn from persons in the commodities business.[11] This is implicit in this court's decision in Tamari II ; any other view would mean that Tamari II required a futile arbitration process before a panel that would in the end merely be found incompetent to hear the case due to bias or the appearance of bias. It is also to be noted that under the agreement to arbitrate the Tamaris had the choice of submitting to arbitration before either the CBOT or the American Arbitration Association. In addition, correspondence of record indicates that Bache offered the Tamaris a third option, submitting to arbitration before the Board of Governors of the New York Stock Exchange. The Tamaris' election to proceed before the CBOT gives a hollow ring to their argument of inherent bias or the appearance thereof in CBOT arbitrators.[12]
 
 
 28
 Finally, if it were necessary to go further, we would find no indication in the record of the arbitration proceeding of actual bias on the part of the arbitrators; their decision that the Tamaris voluntarily agreed to arbitrate is reasonable in view of the record. Even if it were assumed that the Tamaris signed the original agreement to arbitrate under duress, because they could not otherwise obtain a commodity customer account with Bache, they did not make a timely assertion of agreement under duress when a dispute over the contract arose. Instead, they again agreed to arbitration by selecting the CBOT forum, by executing a submission to arbitration with Bache, and by actually proceeding to litigate the case before the arbitration committee. The committee could reasonably have determined that four agreements to arbitrate were sufficient to demonstrate voluntariness on the part of the Tamaris.
 
 IV.
 
 29
 The Tamaris next argue that the arbitration panel was not properly constituted under CBOT rules and the terms of the submission agreement. They argue first that the submission agreement required that the dispute be submitted to "present" members of the arbitration committee, and that most of the members who heard the dispute were not members of the committee when the Tamaris and Bache executed the submission agreement. The agreement also provided, however, for submission of the dispute to "substitutes" for the "present" members. We find no merit in this argument.
 
 
 30
 The Tamaris argue, second, that the agreement provided for submission to a "quorum" of the committee, that CBOT rules define a "quorum" as five members, and that the fact that seven members heard the case renders the award invalid. A "quorum" is "(s)uch a number of the officers or members of any body as is, when duly assembled, legally competent to transact business." Webster's New International Dictionary 2046 (2d ed. 1937). Plainly, the agreement meant only that the dispute must be resolved by at least the minimum number necessary to make up a quorum, not that a number in excess of the minimum was unacceptable.
 
 
 31
 Third, the Tamaris argue that because CBOT rules require an arbitrator to continue to hear a case if his term on the arbitration committee expires during the pendency of an arbitration and his presence on the panel is necessary to preserve a quorum, the failure of panel members whose terms expired during the pendency of the instant arbitration to step down when their presence was not necessary to preserve a quorum voids the award. The rule does not speak to the situation in which presence is not necessary to preserve a quorum. The holdover panel members were not, therefore, in violation of CBOT rules, and the award is unaffected.
 
 V.
 
 32
 The Tamaris next argue that the award must be set aside because the appeals procedure provided by the CBOT was meaningless. They base the argument on the fact that the appeals committee did not accept written briefs or oral argument in considering the appeal. The Tamaris had the opportunity to communicate with the appeals committee and present any argument they wished by letter. They chose not to do so. We know of no right to a non-judicial review of an arbitration award other than as provided by the terms of the parties' agreement. The appeal that was here accorded was in compliance with the parties' agreement and the CBOT rules and was not unfair to the Tamaris. Their contention is therefore without merit.
 
 VI.
 
 33
 Finally, the Tamaris argue that the district court erred in failing to accord them discovery with respect to the Klopfenstein-Fivian episode and the hiring of the CBOT Secretary by Bache. We have held that the district court acted correctly in dismissing the Tamaris' complaint as to these matters, and it follows from that ruling that no facts that the Tamaris could discover would render their claim sufficient. Moreover, with respect to the Klopfenstein-Fivian matter, the Tamaris had a full opportunity to explore the circumstances in the arbitration hearings.
 
 
 34
 The judgment of the district court is affirmed.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 The first three actions are as follows: Tamari v. Bache & Co., No. 75 C 4189 (N.D.Ill., May 19, 1976), appeal dismissed, No. 76-1729 (7th Cir., Sept. 23, 1976) (Tamari I ); Tamari v. Bache & Co., No. 76 C 21 (N.D.Ill., May 1976), aff'd, 565 F.2d 1194 (7th Cir. 1977), cert. denied, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978) (Tamari II ); Tamari v. Conrad, No. 76 C 2071 (N.D.Ill., Nov. 15, 1976), aff'd, 552 F.2d 778 (7th Cir. 1977) (Tamari III )
 Tamari I was a preliminary order that was not reviewed by this court and that has no relevance to the case at bar. The action is apparently still pending as against Bache's subsidiary in Lebanon. Tamari II held that the CBOT had authority to arbitrate the dispute under the agreements of the parties and that the issue of whether the Tamaris had voluntarily submitted their claim to arbitration was for decision by the arbitrators. Tamari III involved nearly the same subject matter as Tamari II and was dismissed. In addition to these cases, the Tamaris have filed complaints with the CBOT Business Conduct Committee and the Commodities Futures Trading Commission; they obtained no relief on either complaint.
 
 
 [2]
 Our power to set aside an arbitration award is limited to the grounds set forth in 9 U.S.C. § 10. National R.R. Passenger Corp. v. Chesapeake & O. Ry., 551 F.2d 136, 141-42 (7th Cir. 1977) (quoting Office of Supply, Republic of Korea v. New York Navigation Co., 469 F.2d 377, 379 (2d Cir. 1972)). The Tamaris apparently rely only on § 10(b) in making their first argument
 
 
 [3]
 Commonwealth Coatings held that § 10(b) implicitly allowed the setting aside of arbitration awards where one or more arbitrators "might reasonably be thought biased against one litigant and favorable to another." 393 U.S. at 150, 89 S.Ct. at 340. Thus, even if actual bias or corruption is not found, the appearance of bias will void the award
 
 
 [4]
 Plaintiffs alleged otherwise in their complaint, but the hearing transcript appended to the complaint contains Fivian's testimony that at no time did he talk to Klopfenstein in connection with the employment negotiations and no contrary evidence. The transcript controls the allegations in the complaint under these circumstances, as the Tamaris recognize. Cf. In re Woodmar Realty Co., 294 F.2d 785, 788 (7th Cir. 1961). Moreover, the Tamaris had a full opportunity to question Klopfenstein about this matter at the April 7 arbitration hearing. They evidently failed to do so, and we do not think justice requires that they be given a second chance when what evidence there is of record indicates that their allegation is unfounded
 
 
 [5]
 Plaintiffs argue that they have been injured by procedural rulings made during Klopfenstein's tenure on the committee. We find no evidence of procedural bias, and neither did the district court. Plaintiffs also argue that Bache's counsel's argument to the committee urging them not to recuse themselves and force the parties to begin again an arbitration process that had already consumed in the neighborhood of two years was so inflammatory and prejudicial that the award must be vacated. Plaintiffs argue that arbitrators, like jurors in a criminal case, must be protected from the prejudicial argument of counsel. Initially, it does not appear that this issue was raised in the district court. Even if it was, we think plaintiffs overestimate the power of opposing counsel's rhetoric. We also reject the offered analogy to criminal trials. We doubt that a mere declamation concerning a posited duty to stand up to unfounded allegations of taint greatly swayed the minds of arbitrators chosen for their business knowledge and experience. Even assuming it did, the Tamaris had the chance to respond in a similar vein if they chose. We can find no prejudice to the Tamaris here
 
 
 [6]
 See note 4 supra
 
 
 [7]
 Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 146, 89 S.Ct. 337, 338, 21 L.Ed.2d 301 (1968); Sanko S.S. Co. v. Cook Indus., Inc., 495 F.2d 1260, 1262 (2d Cir. 1973); Rogers v. Shering Corp., 165 F.Supp. 295, 297 (D.N.J.1958); Johnston v. Security Ins. Co., 6 Cal.App.3d 839, 842, 86 Cal.Rptr. 133, 135 (1970); In re Merrolla, 231 N.Y.S.2d 760, 761 (Sup.Ct., Special Term, Kings Cty. 1962)
 
 
 [8]
 CBOT rule 77, on which the Tamaris rely, provides, in pertinent part,
 The Secretary shall . . .
 . . . attend, in person or by representative all meetings of the Committees on Arbitration and Appeals, and . . . keep an official record of the proceedings thereof. He shall also give notice to such Committees when their services are required, issue the necessary notices and papers to parties, and deliver to the interested parties copies of all awards or findings . . . .
 
 
 [9]
 It seems to us highly unlikely that the only two members of the full committee that were not designated to sit could have altered the outcome of the proceeding had they, and not two others, been designated. Cf. United States Wrestling Fed'n v. Wrestling Div. of the AAU, Inc., 605 F.2d 313, 317 (7th Cir. 1979)
 
 
 [10]
 We do not understand the Tamaris to argue that the award is invalid because the arbitrators "exceeded their powers" within the meaning of 9 U.S.C. § 10(d) when they determined that the agreement to arbitration was voluntary. In any event, this contention would be barred by this court's decision in Tamari II, 565 F.2d at 1201-02
 
 
 [11]
 To conclude otherwise would deal a serious blow to arbitration as a method of dispute settlement. Often one of the major benefits of arbitration is the expertise of arbitrators who are familiar with the subject in question. Commonwealth Coatings Corp. v. Continental Casualty Co., supra, 393 U.S. at 150, 89 S.Ct. at 340 (White, J., concurring)
 
 
 [12]
 The Tamaris also argue that all arbitrators who could have heard their dispute with Bache would have been biased because they all would have had ties to the commodities business. They thus conclude that their choice of forum was of no consequence. This argument is frivolous; it is also precluded by this court's decision in Tamari II, 565 F.2d at 1201-02