GRAPHIC ARTS INTERNATIONAL
UNION, LOCAL 97–B

v.

HADDON CRAFTSMEN, INC.

HADDON CRAFTSMEN, INC.

v.

GRAPHIC ARTS INTERNATIONAL
UNION, LOCAL 97–B

Civ. Nos. 78–862, 79–466.

United States District Court,
M. D. Pennsylvania.

Dec. 14, 1979.

---

Ira Silverstein, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for plaintiff.

Sheldon Rosenberg, Robert Ufberg, Scranton, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. *INTRODUCTION*

It is by now an axiom of federal labor law that an award following properly conducted arbitration proceedings shall not be set aside so long as the award "draws its essence from the collective bargaining agreement." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424

(1960); *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3rd Cir. 1969). As explained by the Court in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 599, 80 S.Ct. at 1362:

> The question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

This rudimentary principle recognizes that disputed terms of a collective bargaining agreement may be susceptible to several reasonable interpretations and that deference should ordinarily be accorded the arbitrator's interpretation.

The above-captioned actions present the somewhat unique situation of two conflicting interpretations of the same contractual provision by *different* arbitrators. In Civil No. 78–862, Arbitration No. 1, the arbitrator (Harry Pollock) found in favor of Haddon Craftsmen, Inc. (Company) (Award dated June 28, 1978); in Civil No. 79–466, Arbitration No. 2, the arbitrator (I. Herman Stern) found in favor of Local 97–B of the Graphic Arts International Union (Union) (Award dated March 29, 1979). These actions are now before the Court on the Company's motions for summary judgment.

Both the Company and the Union contend that the award adverse to their respective positions fails to draw its essence from the collective bargaining agreement. In effect, the Company and the Union call upon this Court to resolve the conflict between the awards by placing its imprimatur on one of the two. The invitation need not be accepted. Having examined the record and the applicable law I find that both awards are rational interpretations of the collective bargaining agreement and, therefore, may not be judicially overruled.

The parties have also voiced technical objections to the arbitration awards. The Union contends that Arbitrator Pollock, who decided the dispute against it, was not impartial and failed to disclose prior associations that might create an impression of bias. The Company contends that Arbitrator Stern, who resolved the matter against it, denied it a fair hearing by failing to permit testimony on matters covered by Company counsel in his opening statements and by attempting to rule that the contrary determination by Arbitrator Pollock was clearly erroneous. These technical objections are without substance and do not warrant vacation of either award.

Finally, the Union seeks to set aside a separate award upholding the Company's unilateral imposition of a disciplinary program that led to a week-long suspension of one of its members. The Union's grounds are without merit and judgment in the Company's favor will be entered.[1]

## II. GENERAL BACKGROUND

The Union is a "labor organization" as defined in section 2(5) of the Labor Management Relations Act, *as amended*, 29 U.S.C. § 152(5) (LMRA); the Company is an "employer" within the intendment of Section 2(2) of the LMRA, 29 U.S.C. § 152(2) and is engaged in business in the graphic arts industry. The Union and the Company are parties to a collective bargaining agreement that sets up grievance machinery culminating in compulsory arbitration. *See*

---

1. The Union has moved to consolidate these actions. The Company has opposed the consolidation motions. Consolidations of actions presenting common factual *or* legal issues is authorized by Rule 42(a) of the Federal Rules of Civil Procedure as a matter of convenience and economy in judicial administration. *See Johnson v. Manhattan Railway Co.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2383 (1971). It is apparent that a common question of law is presented in these consolidated actions, viz., whether the conflicting arbitration awards concerning the identical contractual provision draw their essence from the collective bargaining agreement. Accordingly, these actions will be consolidated for the purpose of disposing of the Company's summary judgment motions.

Article VIII of the Agreement between Company and Union.[2]

After the Union unsuccessfully grieved the disciplinary suspension of Joseph Havenstrite and the lay-off of 12 admittedly untrained employees out of seniority, the parties proceeded to arbitration before Harry Pollock (Arbitration No. 1). The Pollock awards sustained the Company's actions. The Union then filed suit to vacate Arbitrator Pollock's awards, invoking jurisdiction under section 301 of the LMRA, 29 U.S.C. § 185,[3] and section 10 of the Federal Arbitration Act, 9 U.S.C. § 10.[4] This action is docketed to Civil No. 78–862.

Shortly after the filing of the Union action, another grievance concerning the out of seniority lay-off of 13 additional Company employees proceeded to arbitration before I. Herman Stern (Arbitration No. 2). Arbitrator Stern reached a conclusion contrary to Arbitrator Pollock's and decreed that the Company's actions violated the pertinent seniority provisions of the collective bargaining agreement. The Company subsequently instituted the civil suit docketed to No. 79–466, requesting the vacation of the Stern award. Jurisdiction was also invoked under 29 U.S.C. § 185 and 9 U.S.C. § 10.

### III. DISCUSSION

The parties in the actions before the Court have raised objections that may be described as "technical" or "procedural" [5]

---

2. Article VIII of the collective bargaining agreement provides in pertinent part:

It is mutually understood and agreed that the grievance and arbitration procedure shall be available to the Union and to the Company in accordance with the provisions hereinafter set forth.

The Company shall recognize and deal with the Union Shop Stewards and the Grievance Committee or any other designees of the Union, as the Union Representatives for the adjustment of any grievances which may arise (a) on a change in any shop condition or practice; (b) or on the construction to be placed on this agreement or any part thereof; and (c) on any violation of this agreement. To settle such grievances the following procedure shall be pursued and such decisions as may be reached shall be retroactive to the date the grievance was originally presented.

6. . . . in the event of a discharge or disciplinary action involving an employee the parties agree if a settlement is not reached . . ., the dispute shall be referred within seventy-two (72) hours directly to arbitration under the rules and regulations of the American Arbitration Association, and both parties agree that the decision of the arbitrator so selected shall be final and binding.

9. It is agreed that the arbitrators cannot add to, subtract from, or modify the terms of this contract, or any supplement thereto, including wage scales.

3. Subsection (a) of section 301 provides in pertinent part:

Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. 29 U.S.C. § 185(a).

4. Section 10 of title 9 U.S.C. provides as follows:

In either of the following cases the United States Court in and for the District wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

5. Some of the technical or procedural matters that may justify vacation of an arbitration award are delineated in section 10 of the Federal Arbitration Act, which is set out *in toto* in the preceding footnote. Objections may also be asserted where the award "violates a specific command of some law—usually the National Labor Relations Act; or because the award is too vague and ambiguous for enforcement; or

and objections that go to the merits of the challenged awards. The "technical" objections will be considered first.

### A. Technical Objections

#### 1. *The Pollock Awards*

■ The Union contends that arbitrator Pollock evidenced partiality during the proceedings and that he failed to disclose associations with the management side of the graphic arts industry. It is, of course, well-settled that "evident partiality," *see* 9 U.S.C. § 10(d), and failure to disclose "dealings that might create an impression of possible bias" are grounds for vacating an arbitration award. *See Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 149, 89 S.Ct. 337, 339, 21 L.Ed.2d 301 (1968); *Sanko S.S. Co. v. Cook Industries, Inc.,* 495 F.2d 1260, 1263–64 (2nd Cir. 1973). It is also well-settled, however, that a party may not await an adverse award before asserting objections on grounds of which he had knowledge prior to the award. *See Cook Industries, Inc. v. C. Itoh & Co.,* 449 F.2d 106, 107–08 (2nd Cir. 1971), *cert. denied,* 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972); *Cities Service Oil Co. v. American Mineral Spirits Co.,* 22 F.Supp. 373 (S.D.N.Y.1937). *Cf. Amalgamated Meat Cutters and Butcher Workmen, Local 195 v. Cross Brothers Meat Packers, Inc.,* 518 F.2d 1113, 1121 (3rd Cir. 1975); *West Rock Lodge No. 2120, International Association of Machinists v. Geometric Tool Co.,* 406 F.2d 284, 286 (2nd Cir. 1968).

The record discloses the following undisputed material facts: (1) Arbitrator Pollock has never represented or dealt with the Company; (2) Pollock was no longer actively involved in labor relations matters at the time of the arbitration proceeding; (3) Pollock had previously rendered legal assistance in labor relations matters to firms engaged in the graphic arts industry; (4) counsel for Union learned of this legal representation shortly after the close of the hearings; and (5) counsel for the Union did not object at any time either to the conduct of the hearing or the integrity of the arbitrator.

■ The Union certainly could have interposed an objection prior to Arbitrator Pollock's awards, challenging either the conduct of the hearings or the arbitrator's failure to disclose his association with the graphic arts industry. The Union's belated cry of "bias" cannot now form a basis for setting aside the award; its silence constituted a waiver of this objection. *See Cook Industries, Inc. v. C. Itoh & Co.,* 449 F.2d at 107–08.

■ Assuming, however, that the objections are not waived, an examination of the record fails to reveal "evident partiality" toward the Company's interests. The Union asserts that the following grounds suggest partiality and necessitate an evidentiary hearing on the question of partiality:

(a) Arbitrator Pollock's behavior during the hearing indicated hostility to the Union's position and Union counsel found himself debating the issues with the arbitrator.

(b) Pollock's affidavit submitted in support of the Company's summary judgment motion mistakenly notes that post-hearing briefs were filed by the parties.

(c) Pollock's deposition testimony indicates that he has cooperated closely with Company counsel in the preparation of the Company's motion.

(d) Pollock consulted with Company counsel regarding a possible law suit against the Union for his unpaid arbitration fee.

(e) Pollock refused to produce portions of his file on the arbitration *sub judice.*

I do not believe that these broad grounds, which are unsubstantiated by specific factual averments, indicate that Pollock was untrue to his primary obligation: the neutral interpretation and application of the terms

because of inconsistency with public policy." *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d at 1128–29 n.27 (citations omitted). *See also International Brotherhood of Teamsters, Local*

*249 v. Western Pennsylvania Motor Carriers Ass'n.,* 574 F.2d 783, 786 n.5 (3rd Cir.), *cert. denied,* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978).

of the collective bargaining agreement. Scrutiny of the sole record of the arbitration proceedings, the opinions accompanying Pollock's awards, reveals that his decisions were based upon a reasoned application of the facts to the collective bargaining agreement; the opinions do not evince partiality. *See Standard Tankers Co. v. Motor Tank Vessel, Akti*, 438 F.Supp. 153, 160 (E.D.N.C.1977).

While Pollock's conduct during the proceedings may have suggested that he was unimpressed with the Union's case, there is nothing in the record to indicate that the arbitrator prevented the presentation of evidence, examination of witnesses, or legal and factual arguments. Furthermore, the fact that counsel for the Union debated the issues with the arbitrator cannot be construed to mean that Pollock was biased. Assuming a devil's advocate role is a familiar ploy of the neutral decision-maker. In short, it does not appear that the Union was denied a fair hearing or an impartial arbitrator.

The arbitrator's participation in this lawsuit also does not evidence bias or prejudice. He is not a voluntary participant; his presence was interjected by the Union's attack on his integrity. Moreover, his affidavit accompanying the Company's motion is offered in defense of the Union's challenge; it does not suggest "close cooperation with Company counsel." [5a]

The Union also contends that Pollock's failure to divulge his prior legal representation of management in the graphic arts industry is evidence of partiality. I do not agree. Many arbitrators have at one time served in a representative capacity for a company or a union. Indeed, it is the arbitrator's expertise and knowledge of the law of the shop that insulates his award from judicial second-guessing. The fact that the arbitrator had represented *other* firms in the graphic arts industry does not impugn his integrity. Furthermore, what little weight, if any, such prior dealings have in manifesting "evident partiality" is offset by the fact that Pollock had terminated his law practice in labor relations matters and that all but one of his ties with the graphic arts industry had been severed by the time of the hearing.

Nevertheless, the Union contends that *Commonwealth Coatings* required disclosure here. The Unions' reliance on that case is misplaced. First, *Commonwealth Coatings* is factually distinguishable. There, unlike in the instant action, the arbitrator had prior dealings with one of the parties to the arbitration. And second, *Commonwealth Coatings* does not compel disclosure of every prior association that might remotely suggest bias. As the Court of Appeals for the Second Circuit has observed:

> The Court in that case required as a matter of fundamental fairness that an arbitrator disclose his financial dealings with one of the parties before the arbitration commences. This case does not mandate that the arbitrator 'provide the parties with his complete and unexpurgated business biography' (concurring opinion of Justice White 393 U.S. 145 at 151, 89 S.Ct. 340 at 340), as [the Union] is seeking here.

*Reed & Martin, Inc. v. Westinghouse Electric Corp.*, 439 F.2d 1268, 1275 (2nd Cir. 1971). *Accord, Standard Tankers Co. v. Motor Tank Vessel, Akti*, 438 F.Supp. at 160.

In short, there is nothing in the record to suggest "evident partiality." An examination of Pollock's written opinion indicates that he did not make the awards on the basis of personal predilections. In addition, his legal representation of some firms in the graphic arts industry is not the type of dealings that had to be revealed under

---

**5a.** Other Union suggestions of bias are unpersuasive. The error in relating that post-trial hearing briefs had been submitted by the parties does not indicate partiality. Post-hearing memoranda are often required in arbitration proceedings and Pollock's mistake may simply reflect his assumption that such briefs had been required here. In addition, the refusal to produce portions of his file is not evidence of partiality. There may well be legitimate grounds, such as privilege, that justify the failure to disclose.

*Commonwealth Coatings.* Accordingly, the Company is entitled to summary judgment on the Union's claim of partiality.

## 2. *The Stern Award*

■ *a. The Exclusion of Evidence* —At the beginning of the hearings before Arbitrator Stern counsel for the Company made two comprehensive and detailed opening statements in which were asserted the facts that the Company would establish by testimonial and documentary evidence. At the conclusion of the second opening statement, counsel for the Union informed Arbitrator Stern that Company counsel's statements could be accepted as evidence. Stern then treated Company counsel's remarks as a stipulation of facts and refused to allow testimony on matters canvassed in the opening statements. Counsel for the Company, although objecting to this ruling, did not adduce any testimony on matters not covered by his opening remarks and conceded at oral argument that no additional evidence would have been forthcoming. The Company now contends that the refusal to entertain evidence provides grounds for vacating the Stern award under 9 U.S.C. §§ 10(c) and (d).

Subsection (c) of 9 U.S.C. § 10 provides, *inter alia*, that an arbitration award may be vacated "[w]here the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." This section "cannot be read, however, to intend that every failure to receive relevant evidence constitutes misconduct which will require the vacation of an arbitrator's award." *Newark Stereotyper's Union No. 18 v. Newark Morning Ledger Co.,* 397 F.2d 594, 599 (3rd Cir.), *cert. denied,* 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968). Only where the failure to admit evidence denies a party a fundamentally fair hearing should the award be set aside. *See Bell Aerospace Co. v. Local 516, UAW,* 500 F.2d 921, 923 (2nd Cir. 1974); *Washington-Baltimore Newspaper*

*Guild, Local 35 v. Washington Post Co.,* 442 F.2d 1234 (D.C.Cir.1971); *Harvey Aluminum v. United Steelworkers,* 263 F.Supp. 488, 493 (C.D.Cal.1967).

It cannot be said that the refusal to receive evidence under the circumstances of this case denied the Company a fair hearing. Counsel's remarks were treated as facts and the Union did not attempt to question them. In addition, the Company was free to adduce testimony on any matters not covered in the opening statements. In fact, Company counsel admitted that there was no evidentiary conflict between the parties and no additional evidence, beyond that mentioned in his opening statement, would have been presented to the arbitrator. Thus, it would appear that the arbitrator had before him all the facts necessary to make a well-reasoned ruling.

Nevertheless, counsel for the Company asserted at oral arguments conducted in Chambers on October 17, 1979, that testimonial evidence may have presented the Company's position in a more favorable light. But this is not a case where the equities of the situation should control the result. It is a case of contract interpretation, pure and simple, and the arbitrator was not free to dispense his own brand of industrial justice. *See United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. at 597, 80 S.Ct. at 1361. Accordingly, since the arbitrator had before him all the necessary facts, the Company was not prejudiced by his refusal to accept cumulative testimony and, therefore, is not entitled to vacation of the Stern award. *See Washington-Baltimore Newspaper Guild, Local 35 v. Washington Post Co.,* 442 F.2d at 1239; *In re CompuDyne Corp.,* 255 F.Supp. 1004, 1008 (E.D.Pa.1966).

■ The Company also argues that vacation is warranted under 9 U.S.C. § 10(d) because the arbitrator exceeded his authority in applying strict rules of evidence and by failing to comply with Rule 28 of the American Arbitration Association.[6] Since the application of rules of evidence and the

---

**6.** This rule provides in pertinent part: "The parties may offer such evidence as they desire. . . . ."

noncompliance with Rule 28 of the American Arbitration Association did not deny the Company a fair hearing, their arguments relative to these points may be summarily disposed of as without merit. *See Newark Stereotyper's Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d at 600.

**b. Consideration of the Pollock Ruling**—The Company urges vacation of the award as exceeding Stern's powers because it included a declaration that the Pollock decision was clearly erroneous. Of course, an arbitrator has no power to overrule a prior decision of another arbitrator and should refrain from expressing an opinion on the soundness of a prior award. However, the consideration of the Pollock award and the declaration that it is "clearly erroneous" are not grounds for impeaching the Stern award. *See Washington Hospital v. Hospital and Health Care Employees, District 1199*, 442 F.Supp. 93, 95 (W.D.Pa. 1978); *Brotherhood of Railroad Trainmen v. St. Louis Southwestern Railway*, 252 F.Supp. 961 (D.D.C.1966), *aff'd*, 380 F.2d 603 (D.C.Cir.), *cert. denied*, 389 U.S. 927, 88 S.Ct. 288, 19 L.Ed.2d 279 (1967). Indeed, it seems somewhat inequitable that the Company is objecting to Stern's examination of the Pollock award. It was the Company that interjected the Pollock decision into the Stern arbitration by arguing that Stern was bound by Pollock's award. Having placed the matter before the arbitrator the Company can hardly argue that it was reversible error for him to scrutinize the Pollock opinion in making his award.

### B. Substantive Objections

Judicial review of the substantive merits of a labor arbitration award is severely circumscribed.[7] "It is not within the province of the reviewing court to agree or to disagree with the conclusion reached or with the specific reasoning employed." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d at 1132. The Court's sole function is to determine whether the award "draws its essence from the collective bargaining agreement." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 598, 80 S.Ct. at 1361; *International Brotherhood of Teamsters, Local 249 v. Western Pennsylvania Motor Carriers Association*, 574 F.2d 783, 786 (3rd Cir.), *cert. denied*, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978). The formula within this circuit for determining whether a labor arbitration award draws its essence from the collective bargaining agreement was announced in *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d at 1128:

> A labor organization award does 'draw its essence from the collective bargaining agreement' if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.

The question before the court then is whether under the canons of contract construction and the law of the shop the collective bargaining agreement is capable of the interpretations made by the arbitrators.[8] *See id.* at 1131.

### 1. The Seniority Awards

Both arbitrators were presented with identical fact patterns. The Company is

---

7. The basic philosophy underlying the Court's 'hands-off' policy is very simple—labor matters are best left to those who understand the language and the workings of the shop, those who have a precise knowledge of what has come to be known as the 'industrial common law'. Even the 'ablest judge cannot be expected to bring the same experience and competence [as an arbitrator] to bear upon the determination of a grievance because he cannot be similarly informed.'

*Local 103, International Union of Electrical Workers v. RCA Corporation*, 516 F.2d 1336, 1340 (3rd Cir. 1975).

8. The pertinent canons of contract construction are identified in § 228 and § 229 of the Restatement (Second) of Contracts (Tent. Draft No. 7 1973) and thoroughly explained in 9 Williston on Contracts §§ 600, 618–21, and 623–24 (3rd ed. 1961).

currently converting its bindery processes from Smyth Sewn Bindery to Perfect Sewn Bindery. This conversion requires an outlay of several millions of dollars for purchases of equipment and machinery. A training period of some length is necessary before this expensive machinery may be competently operated. The Company afforded several opportunities for senior bookbinders "A"[9] to bid for training on the new machinery and warned that failure to undergo the necessary training would force the Company to retain less senior but qualified bookbinders during lay-off periods. The Union also posted the following notice suggesting that senior members bid for training: "We as the Union suggest that our older members bid on these jobs and new equipment. This will keep our seniority in line in case of lay-offs and jobs being eliminated." The greivants involved in both awards, all bookbinders "A", did not heed these warnings and were laid-off out of seniority because they were not qualified to run the Perfect Sewn Bindery machines. The pertinent seniority provision of the collective bargaining agreement provides as follows:

> The Union and Management agree that bumps will be honored within the following classifications and subject to the following conditions:
>
> (a) Bookbinder "A" may bump bookbinder "A" if the employee possesses the necessary seniority. In cases where a suitable replacement is not available to replace the employee on the shift the employee leaves, or where the employee is not trained for the position into which the employee bumps, a training period may be established for up to sixty days before the bump is honored.

Article III, section 10(a) of the Agreement. The issue before each arbitrator was whether the out of seniority lay-offs violated this provision of the collective bargaining agreement.

*a. The Pollock Award*—Pollock concluded that the lay-offs did not violate Article III, section 10(a) of the Agreement. He reasoned that the second sentence of subsection (a) modified the first sentence to the extent that only a properly trained senior bookbinder "A" could bump a properly trained less senior bookbinder "A". He rejected the Union's argument that the clause, "where the employee is not trained for the position into which the employee bumps, a training period *may* be established for up to sixty days before the bump is honored," required the Company to establish a training period of sixty days before it could refuse to honor the bump of an untrained senior bookbinder "A."

Pollock's interpretation is not unreasonable or irrational. He interpreted the word "may" in an acceptable sense and appeared to treat the second, more particular sentence, as a modification of the first sentence. *See* 9 Williston on Contracts § 624 (3rd ed. 1961). His construction also seems to harmonize the seniority provision with the accepted practice for job assignments, which are made on the basis of skill, shift preference and training, not on the basis of seniority. Thus, he could rationally have concluded that the parties contemplated that a bump effecting a change in job assignments would be conditioned on the competency of the employee making the bump and that the establishment of a training period was discretionary and not mandatory before a bump could be refused. Finally, Pollock could reasonably have found that a reading of this seniority provision in its entirety reflected the parties' intent to qualify the bumping rights of bookbinders "A." Subsections (c) and (d) of section 10 of Article III specifically state that senior bookbinders "C" and "D" may bump "without regard for training." The absence of a similar clause in subsection (a), coupled with its second sentence, which is not included in subsections (c) and (d), permits the inference that only the bump of a qualified senior bookbinder "A" had to be honored by the Company.

---

**9.** The job duties of a bookbinder "A" are described in the Agreement as follows: "The set-up, changeover and operation of a machine which requires a certificate of completion from the Union of a state-approved apprenticeship program."

*b. The Stern Award* —The approach taken by Stern appears to have been somewhat more analytic. He carefully dissected the two sentences of section 10(a) and concluded that the first sentence was a "straight", as opposed to a "modified," seniority clause. The sole factor for exercising bumping rights under a straight seniority clause is length of service. A modified seniority clause expressly recognizes other factors, such as skill and training. Since the first sentence did not purport to qualify or condition the exercise of bumping rights, it alone destroyed any residual right the Company enjoyed under Article XII of the Agreement [10] to honor the bumps of only qualified bookbinders "A." Stern construed the second sentence of section 10(a) as granting the Company discretion to require a senior un-trained employee to undergo training for up to sixty days before honoring his bump. Under this view, once the un-trained employee opted to bump, the Company has the right to require that he first submit to training. In other words, the Company could require a bumping senior employee to undergo training; if he refused, the Company need not honor his bump. But, if the Company decided not to require the training of the employee, it would still have to honor the bump.

This is not an irrational construction of the collective bargaining agreement. It analyzes the seniority provision against the backdrop of the law of the shop and reasonably reconciles the conflict between the first and second sentences. Stern's interpretation gives the Company the discretionary right to compel training *after* the decision to bump is made.

Stern's decision thereby avoids the seemingly anomalous yet logical consequences that flow from the Pollock award. For example, under the Pollock award the Company need not honor the bump of an untrained senior employee even if it had not previously offered opportunities to train. Furthermore, under the Pollock award the

Company could choose to establish a training period for some senior employees but not for others. In effect, the Pollock award recognizes significant managerial discretion in the decision to honor the bump of an untrained senior employee.

The Stern award implicitly recognizes the anomaly of giving management discretion to selectively honor the bumps of senior employees. Under Stern's interpretation all bumps must be honored unless the Company, in its discretion, requires training. The Company may selectively require training as a condition to its honoring the bump, but bumping rights for all employees are determined by one objective factor: length of service. Where the Company requires training for a bumping employee it may retain the junior employee until the expiration of the training period. Of course, such over-employment may be avoided by a modified seniority clause. It was not within the province of the arbitrator, however, to read such a term into the contract.

*c. Reprise* —Because the Stern award discards an interpretation that gives management discretion to honor the bump of a senior but untrained employee I believe that it is more reasonable than Pollock's construction. That does not mean, however, that the Pollock award is irrational or exhibits "a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop." The foregoing analysis indicates that under the narrow standard for judicial review both awards must be sustained. This court is simply not free to vacate one award and uphold the other where both draw their essence from the collective bargaining agreement. *Cf. Bettencourt v. Boston Edison Co.,* 560 F.2d 1045, 1049 (1st Cir. 1977); *Washington Hospital v. Hospital and Health Care Employees, District 1199,* 442 F.Supp. 93, 94 (W.D.Pa.1978). Of course, the parties themselves could avoid such a result by simply including in the collective

---

**10.** Article XII of the Agreement provides: "The Company has the rights, powers, functions, privileges and authority that it possessed prior

to entering this Agreement except such as are relinquished or restricted by the terms of this Agreement."

bargaining agreement a bar to re-arbitration of an issue.[11]

## 2. The Disciplinary Suspension Award

Application of the standard of review, the principles of contract interpretation, and the law of the shop also compels sustaining the Pollock award on the disciplinary suspension of Joseph Havenstrite. On June 30, 1977, the Company unilaterally announced the institution of a "quality infraction program," the details of which were outlined in the Pollock award as follows:

The program spells out the action to be taken when an employee fails to meet acceptable quality levels, when a customer complaint is received, or when jobs must be reinspected or rejected. It also spells out how an employee can offset these penalties by producing good work, catching mistakes or by performing outstanding work. In short the program is a progressive disciplinary program based on points allocated for various types of infractions and a method of receiving bonus points.

Between July 11 and December 20, 1977 there were 35 instances of discipline under the plan. The Union did not file any grievances relative to any of the disciplinary actions, ostensibly because it was waiting for someone to be "hurt" by the program. On October 18, 1977, Joseph Havenstrite committed an error that cost $3,925.00 to rectify. For this error he was suspended from work for one week.

Pollock sustained this action on three broad bases. First, he found support for the disciplinary infraction program in section 17 of Article III of the Agreement, which provides:

The Employer will maintain discipline on Company premises and to that end shall promulgate, from time to time as may be necessary, regulations governing employees' conduct on Company premises.

Pollock also sustained the suspension on the basis of the Company's inherent right to discipline for just cause. Finally, the arbitrator found that the Union acquiesced to the disciplinary program by failing to object to the thirty-five prior instances of discipline.

Without expressing an opinion on the soundness of the last two grounds for sustaining the suspension I find that the first ground provides ample basis for the award. The collective bargaining agreement grants the Company the right to promulgate disciplinary regulations and the award sustaining the action draws its essence from that provision, which the court is powerless to overturn.

The Union argues, however, that the unilateral imposition of a disciplinary system constitutes a failure to bargain and a violation of section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). See Alfred M. Lewis, Inc. v. NLRB, 587 F.2d 403, 408 (9th Cir. 1978). This argument misses the point. The question before the arbitrator was not whether the imposition of the program constituted an unfair labor practice but whether it violated the terms of the collective bargaining agreement. A charge of an unfair labor practice is not necessarily coextensive with a charge of a violation of the collective bargaining agreement. See International Union of Electrical Workers v. General Electric Co., 278 F.Supp. 991, 1002 (S.D.N.Y.), modified on other grounds, 407 F.2d 253 (2nd Cir. 1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969). Arbitrator Pollock properly constrained himself to an interpretation of the terms of the contract. The Union, of course, is free to file a charge with the NLRB; this Court is not free to overturn an otherwise valid arbitration award.

## IV. CONCLUSION

Application of the appropriate legal principles to the undisputed material facts compels the conclusion that the arbitration

11. It should be noted that a prior arbitration award does not have res judicata effects. See Brotherhood of Railroad Trainmen v. Denver and Rio Grande Western Railroad, 370 F.2d 833, 835–36 (10th Cir. 1966), cert. denied, 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 456 (1967).

awards should not be set aside. Accordingly, in Civil No. 78–862, judgment will be entered in favor of the Company. In Civil No. 79–466, the Company's motion for summary judgment will be denied and judgment will be entered in favor of the Union.[12]

---

12. Judgment may appropriately be entered in favor of the non-moving party. *See* 10 C. WRIGHT & A. MILLER § 2720 (1973).