**Larry E. WASHBURN**

v.

**James R. McMANUS.**

**5:92CV00135(TFGD).**

United States District Court,
D. Connecticut.

Sept. 6, 1994.

John F. Carberry, Cummings & Lockwood, Stamford, CT, for plaintiff.

Dorit S. Heimer, Alfred U. Pavlis, Levett, Rockwood & Sanders, Westport, CT, for defendant.

## ORDER

DALY, District Judge.

After careful review of the parties' submissions and over objection, Magistrate Judge Margolis' Recommended Ruling is hereby AFFIRMED, APPROVED, and ADOPTED. The Clerk of Court is directed to close the file in this matter.

SO ORDERED.

## RECOMMENDED RULING ON PENDING MOTIONS

MARGOLIS, United States Magistrate Judge.

On March 10, 1992, plaintiff Larry E. Washburn commenced this diversity action against defendant James R. McManus for breach of contract, arising from defendant's alleged failure to make payments according to a stock purchase agreement. On July 9, 1992, this Magistrate Judge issued a Ruling on Defendant's Motion to Stay Litigation Pending Arbitration (Dkt. # 21) ["Prior Ruling"], which was approved by U.S. District Judge T.F. Gilroy Daly on August 17, 1992, absent objection.

As set forth in the Prior Ruling (at 2), from 1972 through October 1988, plaintiff was employed by Marketing Corporation of America ["MCA"], from which plaintiff ac-

quired stock under a stock option plan. On or about July 1, 1986, plaintiff entered into a Stockholders Agreement, which provided that when a stockholder ceased to be an employee of MCA, he or she was required to offer his or her stock first to MCA, next to defendant (who was MCA's chief executive officer), and then to any remaining stockholders. On October 6, 1988, defendant agreed to purchase plaintiff's shares for $1,216,800, with a $121,680 cash payment and $1,095,120 promissory note paid in several installments. After paying more than $500,000 to plaintiff, defendant ceased making any further payments.

Arbitration proceedings were held during June–July 1993 (see Dkt. # 24) before Attorney Irving Slifkin, selected by the American Arbitration Association ["AAA"]. On December 18, 1993, Slifkin issued his Award of Arbitrator, in which he awarded $851,760.00 to plaintiff and denied defendant's counterclaims.

Three post-arbitration motions are now pending before the Court. First, on January 10, 1994, defendant filed a Motion to Vacate Arbitration Award, brief in support, and affidavit of counsel (Dkt. ## 25–27),[1] on the basis of evident partiality. On January 31, 1994, plaintiff filed his brief in opposition (Dkt. # 34).[2] With permission of the court (see 2/17/94 endorsement on Dkt. # 37), on February 17, 1994, defendant filed his reply brief (Dkt. # 39).[3]

Second, on January 18, 1994, plaintiff filed a Motion to Correct Arbitration and brief in support (Dkt. ## 28–30), regarding the misspelling of defendant's name in the Award of

Arbitration. And third, that same day, plaintiff filed a Motion for Order Confirming Arbitration Award and brief in support (Dkt. ## 31–33). Defendant filed his brief in opposition on February 8, 1994 (Dkt. # 36).

These motions were referred to this Magistrate Judge (Dkt. ## 35 & 38). For the reasons stated below, plaintiff's motions are granted and defendant's motion is denied.

## I. DISCUSSION

As set forth in the parties' submissions, in accordance with the AAA Commercial Arbitration Rule 13, counsel were provided with a list of nine potential arbitrators, and through elimination of names, Attorney Irving Slifkin was assigned to this matter (Pavlis Aff't ¶¶ 5–8 & Exhs. A–D). During the arbitration proceedings, defendant asserted a counterclaim for rescission of the contract, based upon a claim that plaintiff fraudulently induced defendant into buying the stock, in that plaintiff misrepresented that he was retiring from work, but instead started his own marketing business and, according to defendant, diverted accounts from MCA (Pavlis Aff't ¶¶ 12–13 & Exh. E).

The AAA closed the arbitration hearing on November 18, 1993, after the submission of post-hearing briefs and reply briefs (Pavlis Aff't ¶ 14; Defendant's Reply Brief, Exh. A). On December 18, 1993, Slifkin issued his Award of Arbitration, in which he ruled for plaintiff, awarding him $851,760.00, the principal balance of the outstanding promissory note, plus interest of 8% per annum, and

---

1. Eight exhibits were attached to the Affidavit of Attorney Alfred U. Pavlis ["Pavlis Aff't"] (Dkt. # 27), which were copies of the following: AAA Commercial Arbitration Rules, as amended on May 1, 1992 (Exh. A); letter, dated September 21, 1992, from Jeffrey T. Zaino, AAA's Case Administrator, to both counsel, with two résumés attached (Exh. B); letter, dated October 7, 1992, from Attorney Pavlis to Zaino, with attachment selecting Slifkin (Exh. C); letter, dated October 9, 1992, from Zaino to both counsel, appointing Slifkin (Exh. D); defendant's counterclaim, dated February 16, 1993 (Exh. E); Slifkin's Award of Arbitrator, dated December 18, 1993 (Exh. F); Slifkin's affidavit in support of application for prejudgment remedy, dated July 8, 1988, in Slifkin v. Condec Corp., Dkt. No. 81–55883 (Super.Ct. Judicial District of Stamford/Norwalk at

Stamford) (Exh. F); and plaintiff's trial memorandum, dated August 1, 1988, in Slifkin v. Condec Corp. (Exh. G).

2. Five exhibits were attached to this brief, including copies of: the promissory note, dated October 15, 1988 (Exh. A); plaintiff's complaint, filed March 10, 1992 (Exh. B); the Prior Ruling, filed July 9, 1992 (Exh. C); Slifkin's Award of Decision, dated December 18, 1993 (Exh. D); and Slifkin v. Condec Corp., 13 Conn.App. 538, 538 A.2d 231 (App.Ct.1988) (Exh. E).

3. There was one exhibit attached, a copy of a letter, dated November 18, 1993, from Zaino to both counsel (Exh. A).

denying defendant's counterclaim (Pavlis Aff't ¶ 16 & Exh. F; Plaintiff's Exh. D).

[1] In his motion, defendant claims evident partiality and arbitrator misconduct, in that Slifkin was a plaintiff in a lawsuit against his former employer, *Slifkin v. Condec Corp.*, in which he sought pension and retirement benefits owed to him (*see* Pavlis Aff't ¶¶ 15 & 17, & Exhs. G–H; Plaintiff's Exh. E; *Slifkin v. Condec Corp.*, 13 Conn. App. 538, 538 A.2d 231 (App.Ct.1988)). According to defense counsel, he did not become aware of the *Slifkin v. Condec* litigation until December 3, 1993, while preparing for a court hearing on an unrelated matter; he did not contact the AAA because the hearings in the instant matter were closed and a decision was imminent (Pavlis Aff't ¶ 15).

## A. DEFENDANT'S MOTION TO VACATE

The Federal Arbitration Act ["FAA"], provides that "upon the application of any party to [an] arbitration," a district court may vacate an arbitration award:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

This summer, the Second Circuit summarized this section as follows:

> By enumerating the grounds for vacating an arbitration award, and specifying that those grounds may be shown "upon the application of any party," Congress evidenced its intent that the party making the application should also bear the burden of proving the defect.

> Our interpretation of the statutory language is supported by the FAA's strong presumption in favor of enforcing arbitration awards. It follows from this presumption that the award is valid unless it is proven otherwise. Under the FAA, the validity of an award is subject to attack only on those grounds listed in § 10, and the policy of the FAA requires that the award be enforced unless one of those grounds is affirmatively shown to exist.

*Wall Street Assocs., L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 849 (2d Cir.1994) (multiple citations omitted) ["*Wall Street*"].

As the Second Circuit further observed in *Wall Street*, a court's "role in reviewing an arbitration award is 'extremely limited.'" *Id.* at 849 (citation omitted). The court's role is so limited because comprehensive judicial scrutiny would frustrate an important purpose of arbitration—the avoidance of the expense and delay of litigation. *Health Services Management Corp. v. Hughes*, 975 F.2d 1253, 1258 (7th Cir.1992) ["*Health Services*"]; *Saxis Steamship Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir.1967) ["*Saxis Steamship*"].

### 1. EVIDENT PARTIALITY

When a party makes a claim of arbitrator bias, the court is under an obligation to scan the record to see if the arbitrator's actions reveal partiality. *Saxis Steamship, supra*, 375 F.2d at 582.[4] Motions to vacate arbitration awards based on claims of evident partiality are reviewed on a pragmatic, case-by-case approach. *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 700 (2d Cir.1978) ["*Andros Compania*"]. This case-by-case approach is the only practical method to deal with the "infinite number of possibilities of claims for some connective basis for disqualification...." *U.S. Wrestling Federation v.*

---

4. Here, neither party included a transcript or tape recording of the arbitration proceedings. As a result, this decision is based only upon exhibits submitted by the parties, including the Award of Arbitrator, dated December 18, 1993.

*Wrestling Division of the AAU, Inc.,* 605 F.2d 313, 318 (7th Cir.1979) ["*Wrestling Federation*"]. The lack of more concrete guidelines, however, hinders the efficiency and economy of arbitration by allowing the loser in a proceeding to extend the dispute through additional months or years of subsequent litigation. *Id.* at 318–19.

To bolster the speed and effectiveness of arbitration, courts emphasize the finality of awards and provide several hurdles to those who would challenge them. The Second Circuit has "not been quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information." *Andros Compania, supra,* 579 F.2d at 700. Reviewing courts share a "traditional reluctance" to ignore the results of arbitration proceedings by questioning the award on its merits or holding arbitrators to the same standards as federal judges. *Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds,* 748 F.2d 79, 81 (2d Cir.1984) ["*Morelite Construction*"]. Judges are wary of "encourag[ing] the losing party to conduct a background investigation of each of the arbitrators.... This would only increase the cost and undermine the finality of arbitration, contrary to the purpose of the United States Arbitration Act of making arbitration a swift, inexpensive, and effective substitute for judicial dispute resolution." *Merit Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673, 683 (7th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983) ["*Merit Ins.*"].

 Like the other grounds for vacating an arbitration, the party seeking vacatur in a district court bears the burden of showing facts which would create a reasonable belief of arbitrator bias. *Middlesex Mutual Ins. Co. v. Levine,* 675 F.2d 1197, 1201 (11th Cir.1982) (*per curiam*) ["*Middlesex Mutual*"]; *Reed & Martin, Inc. v. Westinghouse Electric Corp.,* 439 F.2d 1268, 1275 (2d Cir. 1971) ["*Reed & Martin*"]; *Saxis Steamship Co., supra,* 375 F.2d at 582. The challenger must meet a "heavy" burden to overcome the great weight courts give to the finality of awards. *Peoples Security Life Ins. Co. v. Monumental Life Ins. Co.,* 991 F.2d 141, 146 (4th Cir.1993) ["*Peoples Security*"]; *Austin*

*South I, Ltd. v. Barton–Malow Co.,* 799 F.Supp. 1135, 1142 (M.D.Fla.1992) ["*Austin South*"]. "[T]he claimant must establish specific facts that indicate improper motives on the part of an arbitrator." *Peoples Security, supra,* 991 F.2d at 146.

The leading United States Supreme Court case concerning claims of arbitral evident partiality is *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), *reh. denied,* 393 U.S. 1112, 89 S.Ct. 848, 21 L.Ed.2d 812 (1969) ["*Commonwealth Coatings*"]. Several courts have remarked on the muddled state of the law concerning evident partiality, due in part to this decision. *Morelite Construction, supra,* 748 F.2d at 82–84; *Merit Ins., supra,* 714 F.2d at 681–82.

In writing for the plurality in *Commonwealth Coatings,* Justice Black stated that arbitrators should be held to even higher standards than Article III judges: "[W]e should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review." 393 U.S. at 149, 89 S.Ct. at 339. Justice Black found the standard for federal judges to be applicable to arbitrators; in quoting that applicable canon, Justice Black wrote that a judge should "be particularly careful to avoid such action as may reasonably tend to awaken suspicion that his social or business relations or friendships constitute an element in influencing his judicial conduct." *Id.* at 149–50, 89 S.Ct. at 339–40 (citation omitted). He also found support in Section 18 of the Rules of the AAA, which provides: "[T]he prospective Arbitrator is requested to disclose any circumstances likely to create a presumption of bias or which he believes might disqualify him as an impartial Arbitrator." *Id.* at 149, 89 S.Ct. at 339. Based on these rules, Justice Black concluded that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Id.* at 150, 89 S.Ct. at 340.

While agreeing with the result, Justice White in his concurrence adhered to a very different standard: "The Court does not de-

cide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges." *Id.* In fact, Justice White acknowledged that there is a tradeoff between arbitrator experience and total partiality: "It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function." *Id.* Only so much disclosure is needed, Justice White indicated: "[A]n arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography." *Id.* at 151, 89 S.Ct. at 340. Courts should encourage—but not require—disclosure of circumstances which might lead to scrutiny, Justice White wrote: "The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality." *Id.*

■ The lower courts, however, have adhered to Justice White's concurrence, rather than Justice Black's plurality decision. *See, e.g., Morelite Construction, supra,* 748 F.2d at 82–84; *Wrestling Federation, supra,* 605 F.2d at 319; *Andros Compania, supra,* 579 F.2d at 699; *Metropolitan Prop. & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co.,* 780 F.Supp. 885, 891 (D.Conn.1991) ["*Metropolitan Prop.*"]. "[S]ince his vote was essential to a majority, what he said the Court did not decide the Court did not decide, whatever Justice Black may have hoped." *Merit Ins., supra,* 714 F.2d at 682; *see also Peabody v. Rotan Mosle, Inc.,* 677 F.Supp. 1135, 1138 (M.D.Fla.1987). Thus, arbitrators are not held to the same ethical standards as Article III judges. *Morelite Construction, supra,* 748 F.2d at 83; *Peoples Security, supra,* 991 F.2d at 146.[5]

■ The lower courts have had differing interpretations as to the standard of evident partiality required by *Commonwealth Coatings.* The range of what courts have said must be revealed run from "any circumstance" which might lead to an appearance of bias, *Middlesex Mutual, supra,* 675 F.2d at 1201; *Health Servs., supra,* 975 F.2d at 1259; *Metropolitan Prop., supra,* 780 F.Supp. at 893; to "any dealings," *Sanko S.S. Co., Ltd. v. Cook Industries, Inc.,* 495 F.2d 1260, 1263 (2d Cir.1973) ["*Sanko*"]; to anything likely to create a "reasonable" appearance of partiality, *Local 530, AFSCME, Council 15 v. City of New Haven,* 9 Conn.App. 260, 271, 518 A.2d 941 (App.Ct.1986) ["*Local 530*"]; to "powerfully suggestive" circumstances, *Merit Ins., supra,* 714 F.2d at 681. It is now well established that there must be "more" than mere appearance of bias to vacate an award. *See Peoples Security, supra,* 991 F.2d at 146; *Pitta v. Hotel Ass'n of New York City, Inc.,* 806 F.2d 419, 423 (2d Cir.1986); *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 173–74 (2d Cir.1984) ["*Florasynth*"]; *Morelite Construction, supra,* 748 F.2d at 83–84; *Metropolitan Prop., supra,* 780 F.Supp. at 891; *Sun Refining & Marketing Co. v. Statheros Shipping Corp.,* 761 F.Supp. 293, 299 (S.D.N.Y.), *aff'd mem.,* 948 F.2d 1277 (2d Cir.1991) ["*Sun Refining*"]; *Hunt v. Mobil Oil Corp.,* 654 F.Supp. 1487, 1497 (S.D.N.Y. 1987); *Sofia Shipping Co., Ltd. v. Amoco Transport Co.,* 628 F.Supp. 116, 120 (S.D.N.Y.1986) ["*Sofia Shipping*"]; *Local 530, supra,* 9 Conn.App. at 274.

Few courts, however, have given clear indications of just how much more is required. Several courts have insisted on "direct, definite" connections between the arbitrator and the circumstance. *See Peoples Security, supra,* 991 F.2d at 146; *Health Servs., supra,* 975 F.2d at 1264; *Middlesex Mutual, supra,* 675 F.2d at 1202; *Wrestling Federation, supra,* 605 F.2d at 318; *Austin South, supra,* 799 F.Supp. at 1142; *Sun Refining, supra,* 761 F.Supp. at 298; *Sofia Shipping, supra,* 628 F.Supp. at 119. Speculation alone is not enough. *Sofia Shipping, supra,* 628 F.Supp. at 119; *see also Health Servs., supra,* 975 F.2d at 1264; *Middlesex Mutual Ins. Co.,* 675 F.2d at 1202; *Wrestling Federation, supra,* 605 F.2d at 318 ("The interest or bias of an arbitrator must be direct, definite, and capable of demonstration rather than remote, uncertain, or speculative.") (citation omitted).

---

5. The Seventh Circuit described much of Justice Black's opinion as being dictum. *Merit Ins., supra,* 714 F.2d at 681–82.

In *Morelite Construction, supra,* the Second Circuit instituted the "reasonable person standard": "[W]e hold that 'evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." 748 F.2d at 84. Other courts have followed suit. *Peoples Security, supra,* 991 F.2d at 146; *Local 530, supra,* 9 Conn.App. at 274 ("We conclude that 'evident partiality' will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration. To put it in the vernacular, 'evident partiality' exists where it reasonably looks as though a given arbitrator would tend to favor one of the parties.").

■ Circumstances rise to the level of evident partiality only when they are substantive and material. The party alleging impropriety "must establish facts that create a reasonable impression of bias or misconduct." *Metropolitan Prop., supra,* 780 F.Supp. at 891 (multiple citations omitted). In practical terms, this has resulted in findings of bias because of a relationship, financial interest, or some misconduct during the course of the arbitration proceedings. Most commonly, the facts involve a relationship— such as arbitrator to party, arbitrator to party's counsel, arbitrator to witness, arbitrator to business connected to a party, and financial relationships. Justice Black, in citing the Canon of Judicial Ethics, referred to "social or business relations or friendships." *Commonwealth Coatings, supra,* 393 U.S. at 150, 89 S.Ct. at 340. In his comparison of arbitrator standards, Justice Black mentioned "pecuniary interest," *id.* at 148, which would disqualify judges or jurors. Justice White also referred to "any financial transactions," *id.* at 151, 89 S.Ct. at 340, and an arbitrator's "substantial interest in a firm which has done more than a trivial business with a party," *id.* at 151–152, 89 S.Ct. at 340–41. Rule 19 of the American Arbitration

Association's Commercial Arbitration Rules,[6] while requiring disclosure of "any circumstance likely to affect impartiality," refers specifically only to "financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives."

As Justice White noted in *Commonwealth Coatings,* not all relationships between an arbitrator and a party are significant enough to require disclosure. Even courts applying the "appearance of bias" standard have required more than mere appearance; something more significant must be shown for a court to set aside an arbitrator's ruling. For example, in *Metropolitan Prop., supra,* Judge Nevas of this district found such a circumstance in an arbitrator's *ex parte* meetings with one party to discuss the merits of the party's defenses and to examine potential evidence prior to selection of the arbitration panel. 780 F.Supp. at 890–96. In *Sanko, supra,* the Second Circuit ruled that "where dealings 'might create an impression of possible bias,' they must be disclosed." 465 F.2d at 1263 (footnote omitted). However, the court focused almost solely on the need to disclose relationships between an arbitrator and a party: "[A]rbitrators should disclose fully all their relationships with the parties, whether these ties be of a direct or indirect nature." *Id.* at 1264 (footnote omitted). In *Sanko,* the award was set aside, where the arbitrator had business dealings with one of the parties "running into the millions of dollars." *Id.* at 1262. *See also Middlesex Mutual, supra,* 675 F.2d at 1195–1202 (arbitration award was properly vacated where the arbitrator failed to disclose that his family-owned insurance company was involved in a dispute with the insurers who were parties to the arbitration proceeding; award vacated where the arbitrator's family-owned company was involved in adversarial litigation with parties to the arbitration proceeding, the arbitrator had personally lost

---

**6.** The AAA standards are not, however, applicable in court:

> The American Arbitration Association is in competition not only with other private arbitration services but with the courts in providing—in the case of the private services, selling—an attractive form of dispute settlement.

> It may set its standards as high or as low as it thinks its customers want. The statute has a different purpose.... The standards for judicial intervention are ... narrowly drawn to assure the basic integrity of the arbitration process without meddling in it.

> *Merit Ins., supra,* 714 F.2d at 681.

$85,000 in the litigation, and the arbitrator was under investigation by the Florida Bar for alleged unethical conduct involving those parties).

■ Trivial relationships are insufficient to create a level of impropriety. *Austin South, supra,* 799 F.Supp. at 1142; *Peabody, supra,* 677 F.Supp. at 1138; *see also Morelite Construction, supra,* 748 F.2d at 83 (disqualification of any arbitrator who had professional or even social dealings with one of the parties "would make it impossible, in some circumstances, to find a qualified arbitrator at all."); *Sofia Shipping, supra,* 628 F.Supp. at 119–22 (arbitrator's failure to make full disclosure was not so significant that it constituted "evident partiality"). Failure to disclose even a material fact does not automatically result in vacatur, *Sun Refining, supra,* 761 F.Supp. at 300; *see also Andros Compania, supra,* 579 F.2d at 699–701. Conclusory allegations are insufficient grounds for vacatur. *See Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.,* 794 F.Supp. 1265, 1278–79 (S.D.N.Y. 1992). The mere fact of a prior relationship is not in and of itself sufficient to disqualify arbitrators. "[T]he relationship between the arbitrator and the party's principal must be 'so intimate—personally, socially, professionally, or financially—as to cast serious doubt' on the arbitrator's impartiality." *Health Servs., supra,* 975 F.2d at 1264 (*quoting Merit Ins., supra,* 714 F.2d at 680). If all arbitrators' relationships came into question, finding qualified arbitrators would be a difficult, sometimes impossible, task. Thus, courts have commented that some subjectiveness is tolerated and even expected. *Cf. Pitta, supra,* 806 F.2d at 423 ("[T]he unique role of arbitrators, whose special expertise arises from wide experience in their fields, sometimes leads to a gain of their professional knowledge and skill at the cost of the appearance of less than complete impartiality.") (citations omitted); *Morelite Construction, supra,* 748 F.2d at 83 ("Familiarity with a discipline often comes at the expense of complete impartiality.").

Courts look instead for "repeated" and "significant" dealings between arbitrator and party, *Sanko, supra, Inc.,* 495 F.2d at 1263,

or a "substantial interest," *Commonwealth Coatings, supra,* 393 U.S. at 151–52, 89 S.Ct. at 340–41 (White, J., concurring). Courts have found grounds for vacatur where there have been close family relationships, *Morelite Construction, supra,* 748 F.2d at 82–84 (arbitration award vacated where arbitrator's father was vice-president of international union whose local union was a party to the arbitration proceeding), or because of a direct financial stake, *Pitta, supra,* 806 F.2d at 423–24 (arbitrator disqualified because the subject of the arbitrable grievance directly concerned the arbitrator's own employment for an extended period of time). Arbitration awards have been deemed valid where the alleged relationship was too remote, *Merit Ins., supra,* 714 F.2d at 676–82 (arbitration award confirmed where the president of one of the parties had been the arbitrator's supervisor for two years, but the relationship was distant and impersonal while it existed, the relationship ended fourteen years ago, and the arbitrator had no financial stake in the outcome of the proceeding); *Reed & Martin, supra,* 439 F.2d at 1275 (no grounds for vacatur where arbitrator's law firm had litigated for one of the parties contract clauses identical or similar to those involved in the arbitration); *Peabody, supra,* 677 F.Supp. at 1137–39 (where the brother of the arbitrator's law partner was once the personal attorney of a witness to the arbitration proceeding, the arbitration award was not vacated); *Dowd v. First Omaha Securities Corp.,* 242 Neb. 347, 355–60, 495 N.W.2d 36 (1993) (no partiality found where arbitrator had lawsuit pending against employer of party's expert witness), or because there was no financial interest involved, *Ballantine Books, Inc. v. Capital Distributing Co.,* 302 F.2d 17, 20–21 (2d Cir.1962) (court found no basis for vacatur where arbitration panel chairman had off-the-record conversation with counsel and encouraged settlement and arbitrator was claimed to favor one party's position).

■ What is left, then is a record of case law which requires disclosure of close relationships, especially financial or family relationships, but little else. To require arbitrators to reveal less significant relationships is to read *Commonwealth Coatings* as compel-

ling disclosure of every association that might "remotely suggest bias," which is contrary to such decision. *Graphic Arts Int'l Union, Local 97–B v. Haddon Craftsmen, Inc.*, 489 F.Supp. 1088, 1094 (M.D.Pa.1979) [*"Graphic Arts"*]. "The mere speculative statement of bias by a participant in the arbitration proceeding does not in and of itself justify a claim of disqualification. Otherwise a mere claim would automatically require disqualification." *Local 530, supra,* 9 Conn.App. at 271 (ruling that even under the "appearance of bias" standard, that appearance must be "reasonable"). As the Second Circuit has ruled, courts should not encourage unsuccessful parties to arbitration in their efforts to seek insubstantial, "tenuous relationships" which might form the basis for some theoretically plausible yet completely unsubstantiated cry of bias. *Morelite Construction, supra,* 748 F.2d at 85. To insist on disclosure here, where the lawsuit has only some superficial similarities with the arbitrated case, would be to sanction such "remote and speculative" claims. *Wrestling Federation, supra,* 605 F.2d at 320.

### 2. WAIVER

A party who fails to raise a claim of bias against an arbitrator until after an arbitration award has been made is deemed to have waived the objection. *Swift Independent Packing Co. v. District Union Local One, United Food & Commercial Workers Int'l Union, AFL–CIO,* 575 F.Supp. 912, 916 (N.D.N.Y.1983) [*"Swift Independent"*] ("[T]he settled law of this circuit precludes claims of bias or partiality which are not raised until after an arbitration award has been rendered."); *Garfield & Co. v. Wiest,* 432 F.2d 849, 853 (2d Cir.1970) ("It is well settled that disgruntled losers cannot first raise their objections after an award has been made.") (citations omitted), *cert. denied,* 401 U.S. 940, 91 S.Ct. 939, 28 L.Ed.2d 220 (1971); *Graphic Arts, supra,* 489 F.Supp. at 1093 ("[A] party may not await an adverse award before asserting objections on grounds

of which he had knowledge prior to the award.") (citation omitted). A party cannot have it both ways; he "cannot remain silent, raising no objection during the course of the proceeding, and when an award adverse to him has been handed down, complain of a situation of which he had knowledge from the first. . . . His silence constitutes a waiver of the objection." *Cook Industries, Inc. v. C. Itoh & Co. (America), Inc.,* 449 F.2d 106, 107–08 (2d Cir.1971) (citations omitted).

The situation in the present case is similar to that of *Swift Independent, supra,* in which a party sought to distinguish this "silence equals waiver" line of authority by arguing that it did not become aware of the alleged bias until after the close of the arbitration hearing. 575 F.Supp. at 916. Though the Second Circuit waiver cases cited involved situations in which the objecting party knew or should have known of the prejudicial relationships prior to or during the course of the arbitration hearing, the district court found such cases to be applicable, *id., citing Graphic Arts, supra,* 489 F.Supp. at 1093 (failure to object to arbitrator's bias which was discovered *after* close of hearings, constitutes waiver of right to object at vacatur proceeding). There, as in the present case, the party alleging bias certainly "was capable of noting its objection with the arbitrator at any time after learning of the possibly prejudicial relationships." *Swift Independent, supra,* 575 F.Supp. at 916. A party's "belated cry of 'bias' cannot now form a basis for setting aside the award; its silence constituted a waiver of this objection." *Graphic Arts, supra,* 489 F.Supp. at 1093.

This line of reasoning comports with Rule 38 of the AAA's Commercial Arbitration Rules, which requires written objections to any alleged rule-breaking: "Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object." [7] Here, defendant failed to make any

---

**7.** Defendant argues that no waiver is present in that the arbitration proceedings had concluded. However, such an argument was rejected by the Seventh Circuit in *Health Servs., supra,* where

plaintiff was held to have waived its objections by failing to object in writing until two months after it first learned of the objectionable relationships. 975 F.2d at 1259–64.

communication of even potential concerns until after the arbitrator rendered his decision. This appears to be a case of a party seeking to have the "best of both worlds." *T.A.H. General Partnership v. Southwest Radiographics,* 805 P.2d 1188, 1190 (Colo.App.Ct. 1991). Failure to communicate concerns promptly makes it more difficult to believe later claims of bias; if defendant had been so worried about having the arbitration decided by someone who had at some previous date litigated a case that was in some way vaguely similar, defendant would have done more than he did to communicate his apprehension. *Merit Ins., supra,* 714 F.2d at 683. Accordingly, defendant is deemed to have waived his right to object.

### B. PLAINTIFF'S MOTION TO CONFIRM

 Unless a party seeking to overturn an arbitration award meets its burden of showing reasonable statutory grounds for vacatur, modification or correction, a court must confirm the award. *Barbier v. Shearson Lehman Hutton, Inc.,* 752 F.Supp. 151, 158–59 (S.D.N.Y.1990), *aff'd in relevant part,* 948 F.2d 117 (2d Cir.1971). A confirmation of an arbitration award is a "summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Florasynth, supra,* 750 F.2d at 176. Defendant McManus has failed to meet his burden for vacatur. Accordingly, plaintiff's motion to confirm is granted.

### C. PLAINTIFF'S MOTION TO CORRECT ARBITRATION

Plaintiff's motion, to correct the spelling of defendant's name, is granted, absent objection.

### II. CONCLUSION

For the reasons stated above, defendant's Motion to Vacate Arbitration Award (Dkt. # 25) is *denied;* plaintiff's Motion for Order Confirming Arbitration Award (Dkt. # 31) is

*granted;* and plaintiff's Motion to Correct Arbitration (Dkt. # 28) is *granted.*

*See* 28 U.S.C. § 636(b) (**written objections to ruling must be filed within ten days after service of same**); F.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS,* 892 F.2d 15, 16 (2d Cir.1989) (**failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit**).

Dated at New Haven, Connecticut, this 29th day of July, 1994.

---

Similarly, in *T.A.H. General Partnership v. Southwest Radiographics,* 805 P.2d 1188, 1188–89 (Colo.App.Ct.1991), the court held that a party had waived its objections when it permitted

the lapse of one week after the end of the last arbitration hearing and the rendering of the award to object to the arbitrator.